UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REGINALD S. PUIFORY,           )
                               )
            Plaintiff,         )
                               )
        v.                     )    Civil Action No. 07-1007(RCL)
                               )
EDWARD F. REILLY, JR., et al., )
                               )
            Defendants.        )
                               )

PLAINTIFF'S REPLY BRIEF IN SUPPORT OF HIS
MOTION TO STAY PROCEEDINGS

In this motion to stay, Plaintiff asked the Court to stay this case pending
a ruling in the case of Sellmon v. Reilly, No. 06-1650(ESH), where the Plaintiffs,
after developing significant evidence concerning the practices of both the District
of Columbia Board of Parole and of the United States Parole Commission after
conducting some discovery, have moved for summary judgment.  As Plaintiff explained
in his motion, the Sellmon plaintiffs' summary judgment motions raise the exact
same issues that Plaintiff raised in his complaint.  Attached for the Court's
reference is the Sellmon summary judgment motion that directly addresses the very
Ex Post Facto Clause claims that Plaintiff makes in this case (attached as Exhibit
1).  As a result, in the interests of judicial economy and to avoid inconsistent
judicial determinations regarding the applicability of the Ex Post Facto Clause
to the Defendants' use of their own guidelines instead of the guidelines of the
D.C. Board of Parole, the Court should stay these proceedings.

In opposing Plaintiff's motion, Defendants rely primarily on their assertion
that Plaintiff failed to satisfy the test for injunctive relief set forth in
Mova Pharmaceutical Corp. v. Shalala, 140 F.3d 1060, 1066(D.C. Cir. 1998).
Defendants assert that the Court should deny Plaintiff's motion because Plaintiff
has not demonstrated

RECEIVED

FEB 1 1 2008

NANCY MAYER WHITTINGTON, CLERK

that there is a substantial likelihood that he will succeed on the merits, that he will suffer irreparable harm if the case is not stayed, and that the public interest will be furthered by the stay. The Mova test for injunctive relief, however, does not apply to Plaintiff's motion, which demonstrates that the Court will save significant judicial resources and avoid the potential for inconsistent decisions if it awaits a decision from Judge Huvelle in the Sellmon case.

Instead, this Court has '''inherent power to stay proceedings in control of its docket.''' Feld Entm't, Inc. v. A.S.P.C.A., 2007 WL 3285836, at *1 (D.D.C.Nov.7, 2007)(quoting Dellinger v. Mitchell, 442 F.2d 782, 786(D.C. Cir. 1971)). That power is '''incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.''' Id. (quoting Landis v. N.Am. Co., 299 U.S. 248(1936)); See also Hisler v. Gallaudet Univ., 344 F.Supp.2d 29, 35(D.D.C.2004)("The trail court has broad discretion to stay all proceedings in an action pending resolution of independent proceedings elsewhere."). In determining whether to grant a stay, the Court assesses and balances '''the nature and substantiality of the injustice claimed on either side.''' See Feld, 2007 WL 32585836, at *1 (quoting Gordon v. FDIC, 427 F.2d 578, 580(D.C. Cir. 1970)).

Briefing on the Sellmon plaintiffs' motion for summary judgment is scheduled to conclude on February 6, 2008, and should defendants in that case, who are the same defendants in this case, cross move for summary judgment, their reply brief will be due February 13, 2008. Thus, all dispositive motion briefing in Sellmon will be concluded by the middle of February.

Contrary to Defendants' assertions, the facts of Sellmon Plaintiff Charles Phillips, who was convicted of killing two individuals, are similar, although not

-2-

identical, to those of Plaintiff.  As the attached brief from the Sellmon case
demonstrates, there are substantial issues regarding whether Defendants' application
of the U.S. Parole Commission's guidelines to Mr. Phillips's case, as well as to
Plaintiff's case, created a significant risk of increasing Mr. Phillips's
incarceration - issues that Judge Huvelle will address on a record that benefits
from the plaintiffs' discovery in the Sellmon case (attached as Exhibit 2).  It is
in the public interest to have the constitutional issues raised by the Sellmon
plaintiffs and by Plaintiff in this case addressed on a detailed record, as opposed
to the Defendants' conclusory statements in support of their motion to dismiss.

Furthermore, in this case, Defendants concede that no other "party's interests
will be adversely affected by the stay." Defendants' Opposition at 3.  Thus, it is
clear that Defendants will not suffer any injustice as a result of the stay, and the
balancing of interest clearly tilts in Plaintiff's favor.  The Court will waste
valuable judicial resources by proceeding to address Defendants' pending motion to
dismiss and creates a risk of reaching a decision inconsistent with other members of
this Court addressing the same issues on a more complete record.  The Court, therefore,
should stay these proceedings in the interests of conserving judicial resources and
to avoid inconsistent results.  See Abbey v. Modern Africa One, LLC, 305 B.R. 594,
609 (D.D.C. 2004)(staying case because of the "subtantial overlap of issues" with
another pending case and to avoid, "the possibility of inconsistent reults" and to
conserve "the time and resources of the court and parties"); Bacardi & Co. v.
Empresa Cubana Exporadora  De Alimentos Y Productos Varios, Inc., 2007 WL 1541386,
at *2 (D.D.C. 2007)(granting the plaintiffs' motion to stay the case "in the interest
of judicial economy and because defendants will not be unduly prejudiced").[1]

WHEREFORE, Plaintiff respectfully requests that this Court grant his motion
staying these proceedings.

-3-

Dated February 1, 2008.

Respectfully Submitted,

Reginald S. Puifory, Pro se
Fed. No. 10597-007
USP Lewisburg
P.O. Box 1000
Lewisburg, PA 17837

---

[1]Defendants seek to have the Court address their motion to dismiss on an incomplete record in the hopes of obtaining a favorable decision that they can then cite to Judge Huvelle as instructive in the Sellmon case.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this _4th_ day of _February_ ,2008, the foregoing Plaintiff's Reply Brief in Support of His Motion to Stay Proceedings to Defendants' Opposition Motion to Plaintiff's Motion to Stay Proceedings was mailed to Defendants via first class maile to:

KENNETH ADEBONOJO
Asst. U.S. Attorney
555 4th Street, N.W., E4212
Washington, D.C. 20530

Respectfully Submitted,

*Reginald S. Puifory*

Reginald S. Puifory, pro se
Fed. No. 10597-007
USP Lewisburg
P.O. Box 1000
Lewisburg, PA 17837

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REGINALD S. PUIFORY,              )
                                  )
            Plaintiff,            )
                                  )
        v.                        )  Civil Action No. 07-1007(RCL)
                                  )
EDWARD F. REILLY, JR., et al.,    )
                                  )
            Defendants.           )
                                  )

**ORDER**

This matter having come before this Court on Plaintiff's Reply Brief in Support of His Motion to Stay Proceedings to Defendants Opposition Motion, it is hereby

**ORDERED** that Plaitiff's motion is **GRANTED.**  It is further

**SO ORDERED** this _____ day of _____, 2008.

_____
HON. ROYCE C. LAMBERTH, U.S.D.J.

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TONY R. SELLMON, et al., | : |
| | : |
| **Plaintiffs,** | : |
| | : |
| v. | : **Civil Action No. 06-1650 (ESH)** |
| | : |
| EDWARD F. REILLY, JR., et al., | : |
| | : |
| **Defendants.** | : |

## JOINT MOTION OF PLAINTIFFS CARLTON MARTIN, CHARLES PHILLIPS, TONY SELLMON, DARIUS SMITH, DARU SWINTON, AND BENSON WEST-EL FOR PARTIAL SUMMARY JUDGMENT ON THEIR EX POST FACTO CLAIMS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil

Rules 7(h) and 56.1, Plaintiffs Carlton Martin, Charles Phillips, Tony Sellmon, Darius Smith,

Daru Swinton, and Benson West-El ("Plaintiffs") move this Court to enter summary judgment on

Plaintiffs' claims that the Defendants violated, and continue to violate, the Ex Post Facto Clause

of the United States Constitution.[1]

In support of their motion, Plaintiffs submit the accompanying Memorandum in

Support of the Joint Motion of Plaintiffs Carlton Martin, Charles Phillips, Tony Sellmon, Darius

Smith, Daru Swinton, and Benson West-El for Partial Summary Judgment on Their Ex Post

Facto Claims, Plaintiffs' Joint Statement of Material Facts Not in Dispute, and each Plaintiff's

individual statement of material facts not in dispute, as well all exhibits attached to each of these

documents. As Plaintiffs' memorandum of law in support of this motion and statements of

material facts not in dispute demonstrate, Defendants have violated the Ex Post Facto Clause by

applying their own parole practices, instead of those of the former District of Columbia Board of

---

[1] Contemporaneous with this motion, Plaintiffs Curtis Eason and James Gambrell are filing a separate motion for partial summary judgment on their Ex Post Facto claims. Their joint motion raises issues similar to those addressed herein.

Parole, and thereby creating a significant risk of prolonging Plaintiffs' incarceration. The undisputed facts also demonstrate that Defendants' actual application of their parole practices instead of those of the D.C. Parole Board has lengthened the terms of imprisonment that the Plaintiffs would otherwise have served and, therefore, violates the Ex Post Facto Clause.

For the reasons stated herein, along with those in Plaintiffs' memorandum of law in support of this motion and statements of material facts not in dispute, Plaintiffs request that the Court grant their motion for partial summary judgment with respect to their claims under the Ex Post Facto Clause of the United States Constitution.

Dated: December 14, 2007                          Respectfully Submitted,

                                    By:    /s/ Jason D. Wallach
                                           Jason D. Wallach (Bar No. #456154)
                                           Jared Rodrigues (Bar No. #496125)
                                           Avner E. Mizrahi (Bar No. #500772)
                                           DICKSTEIN SHAPIRO, LLP
                                           1825 Eye Street, NW
                                           Washington, D.C. 20006
                                           (202) 420-2268
                                           (202) 420-2201 facsimile


                                    Attorneys for Plaintiffs

DSMDB-2367262v01

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TONY R. SELLMON, et al., | : |
| | : |
| **Plaintiffs,** | : |
| | : |
| v. | : **Civil Action No. 06-1650 (ESH)** |
| | : |
| EDWARD F. REILLY, JR., et al., | : |
| | : |
| **Defendants.** | : |

## MEMORANDUM IN SUPPORT OF THE JOINT MOTION OF PLAINTIFFS CARLTON MARTIN, CHARLES PHILLIPS, TONY SELLMON, DARIUS SMITH, DARU SWINTON, AND BENSON WEST-EL FOR PARTIAL SUMMARY JUDGMENT ON THEIR EX POST FACTO CLAIMS

Plaintiffs Carlton Martin, Charles Phillips, Tony Sellmon, Darius Smith, Daru Swinton, and Benson West-El (collectively, "Plaintiffs") respectfully submit this memorandum in support of their motion for summary judgment on their claims that Defendants violated the Ex Post Facto Clause of the United States Constitution. In further support, Plaintiffs are each submitting a joint statement and individual statements of undisputed material facts.[1] The undisputed facts prove that Defendants, by applying their own parole practices, instead of those of the District of Columbia Board of Parole (the "D.C. Parole Board" or the "Board"), have created a significant risk of prolonging Plaintiffs' incarceration and, in fact, have increased that incarceration.

---

[1] Plaintiffs' Joint Statement of Undisputed Material Facts is referred and cited to herein as "Plaintiffs' Joint Statement." Each of the plaintiffs' individual statements of undisputed material facts is referred and cited to herein by the particular plaintiff's last name.

## INTRODUCTION

Since August 5, 1998, the United States Parole Commission and the Defendants as its members (collectively, the "USPC") conduct hearings and decide requests for parole of all persons convicted of violating the D.C. Code ("D.C. Code offenders"), including Plaintiffs. At issue in this case are substantial changes the USPC made to the criteria the USPC uses to determine Plaintiffs' suitability for parole. Although the USPC made these changes after Plaintiffs committed their crimes, the USPC has applied the changes on a retroactive basis.

The facts pertinent to Plaintiffs' motion are undisputed. Plaintiffs are inmates serving prison sentences for violating the District of Columbia Code. They have been incarcerated on their current sentences for between nine and thirty-one years and each is served the "minimum sentence" imposed by the sentencing court for his offense (i.e., the period of incarceration an inmate must serve before becoming eligible for parole). Each first became eligible for parole after August 5, 1998.

Prior to August 5, 1998, the D.C. Parole Board conducted the parole hearings of D.C. Code offenders located in District of Columbia facilities and the USPC conducted the parole hearings of D.C. Code offenders located in federal facilities. Both the Board and the USPC, however, applied the Board's parole practices and regulations when conducting such hearings. *See* 28 D.C. Mun. Regs. ("DCMR") §§ 100-531.12; *Cosgrove v. Thornburgh*, 703 F. Supp. 995, 1003-04 (D.D.C. 1988) (holding that the USPC was obligated to apply the D.C. Parole Board's guidelines and could not apply the federal parole guidelines to D.C. Code offenders in federal institutions).

Under the parole statutes, regulations, policies, and practices of the D.C. Parole Board (the "D.C. parole practices"), parole candidates were deemed to have satisfied accountability for their crimes, i.e., the need for punishment and general deterrence, once they served their

DSMDB-2353429v06

minimum sentence. Thus, the only remaining issues under the D.C. parole practices were whether to presume that the parole candidates were suitable for parole, and if so, whether their cases involved "unusual circumstances" that warranted a departure from that presumption.

Under the D.C. parole practices, Plaintiffs would have been *presumed suitable* for parole at their initial parole hearing, which the USPC conducted. To overcome that presumption, the USPC would have needed to identify "unusual circumstances" that warranted ignoring the presumption. Instead, because the USPC used its own parole regulations, policies, practices, and criteria (the "USPC parole practices") to determine Plaintiffs' suitability for parole, the USPC presumed that Plaintiffs were *unsuitable* for parole when they became eligible for parole. Based on this reversed presumption, the USPC increased, in some cases by more than five years, the period of incarceration under the D.C. parole practices that Plaintiffs and other D.C. Code offenders needed to serve to establish presumptive suitability for parole.

Moreover, after Plaintiffs served the periods of incarceration added by the USPC parole policies to their minimum sentence, the USPC ignored the D.C. parole practices for departing from the suitability presumption. Contrary to D.C. parole practices, the USPC used factors premised on the severity of the Plaintiffs' current offense to overcome the presumption. The USPC's obvious goal, which is inconsistent with the Board's policy, was, and is, to increase the punishment imposed by the sentencing judge.

## FACTUAL BACKGROUND

Thousands of District of Columbia Code offenders are currently serving their prison sentences in federal correctional facilities throughout the country. Plaintiffs are D.C. Code offenders who committed their crimes and were sentenced by the Superior Court of the District of Columbia prior to August 5, 1998, when the D.C. Parole Board was responsible for determining the criteria to apply to D.C. Code offenders.

DSMDB-2353429v06

By the time Plaintiffs first became eligible for parole, Congress had abolished the

D.C. Parole Board by enacting the National Capital Revitalization and Self-Government

Improvement Act (the "Revitalization Act"), Pub. L. No. 105-33, § 11231, 111 Stat. 712 (1997).

In addition to abolishing the D.C. Parole Board, the Revitalization Act directed the USPC to

conduct parole hearings for D.C. Code offenders "pursuant to the parole laws and regulations of

the District of Columbia." *Id.* § 11231(c).

Since August 5, 1998, the USPC has decided Plaintiffs' parole requests. For D.C.

Code offenders who received an initial parole hearing prior to August 5, 1998, the USPC

purports to apply the parole guidelines that the D.C. Parole Board had promulgated in 1985 and

published in the District of Columbia Municipal Regulations in 1987 (the "1987 Regulations").

For D.C. Code offenders like Plaintiffs, who became eligible for parole after August 5, 1998, the

USPC promulgated its own parole regulations, which are found in Title 28 of the Code of

Federal Regulations and were implemented in 2000 (the "2000 Guidelines").

Although the 2000 Guidelines sought to maintain the basic structure of the 1987

Regulations, they made significant changes to the D.C. Parole Board's regulations and the

manner in which the Board implemented them. These changes have created a significant risk

that Plaintiffs will serve longer periods of incarceration under the 2000 Guidelines than under the

1987 Regulations.

## I.     UNDER D.C. PAROLE PRACTICES OFFENSE ACCOUNTABILITY WAS THE PURVIEW OF THE SENTENCING COURT AND NOT A FACTOR RELEVANT TO THE GRANT OR DENIAL OF PAROLE

When the D.C. Parole Board adopted the 1987 Regulations, the Board "sought to

structure the exercise of [its] discretion" under the D.C. parole statutes. Report on the

Development of Paroling Policy Guidelines for the District of Columbia Board of Parole at 1,

Exhibit A to Defendants' Response to Plaintiffs' First Request for Production of Documents

Propounded to Defendants James Palmer, Walter Ridley, and James Freeman, *Cosgrove v. Thornburgh* C.A. No. 80-0516 (attached as Exhibit 1 to Plaintiffs' Joint Statement) (the "D.C. Guidelines Report"). As its guide for determining whether to grant or deny parole, the Board used the criteria set forth in the 1987 guidelines. *See id.* at 2 ("[T]he use of guidelines should be seen as an effort to make <u>explicit</u> those factors that will be considered in each individual case.").

The Board believed that the guidelines were "a significant step toward a more coherent parole decision-making process that w[ould] lead both to *increased consistency* in parole release decisions." *Id.* (emphasis added). The D.C. Parole Board hoped that, the guidelines would "[p]romot[e] consistent parole decision-making," "[m]ake more explicit the paroling policies of the Board of Parole," "[i]ncorporat[e] a concern for fairness by ensuring that the time served . . . [wa]s proportionate to the sentence imposed by the court and the risk posed by the offender," and "[a]chiev[e] the sentencing purposes of incapacitation and specific deterrence, while promoting, to the fullest extent possible, the offender's efforts at rehabilitation." *Id.* To further these objectives, the D.C. Parole Board employed three guiding principles in drafting the 1987 Regulations. *See id.* at 2-4.

First, the Board believed that "the touchstone of the parole decision-making process should be based on offender characteristics that have a statistically determined bearing on the offender's risk of future involvement in criminal behavior." *Id.* at 2. Second, the Board did not include among its goals in determining a parole candidate's suitability any consideration of the adequacy of the candidate's sentence for purposes of retribution or general deterrence. *See id.* at 2. ("The second principle behind the guidelines is that the court addresses the purposes of retribution and general deterrence through the sentence it imposes in adult cases."). The Board left such considerations to the sentencing court. Thus, "[a]s a matter of policy, the [Board] d[id]

DSMDB-2353429v06

not and w[ould] not function in a manner that might be viewed as a usurpation of the functions of the sentencing judge." *Id.* at 3-4.

Although it had adopted the federal Salient Factor Score system, the D.C. Parole Board explicitly rejected patterning the 1987 Regulations "after the federal grid which includes an offense severity scale." *Id.* at 17. Instead, it sought to model its decisionmaking process on jurisdictions with a "guideline structure that would be more compatible with the Board's philosophy of letting the court-imposed sentence serve as its offense severity indicant". *Id.*

The Board's third guiding principle in enacting the 1987 Regulations was that the D.C. parole practices should evidence "a rehabilitative focus." *Fletcher*, 433 F.3d at 871; *see* D.C. Guidelines Report at 4. It, therefore, considered "[g]uidelines oriented to the assessment of risk and institutional performance, therefore touching on the need for progress towards rehabilitation" as consistent with the Board's adoption of the 1987 Regulations. *Id.*; *see* *Cosgrove*, 703 F. Supp. at 1003 (explaining that while the federal guidelines were "primarily concerned with punishment and the public safety," the D.C. guidelines "emphasize[d] early release of an offender who respond[ed] favorably to rehabilitative efforts").

## II.    THE D.C. PAROLE BOARD'S 1987 REGULATIONS

The 1987 Regulations "employed an analytic framework that relied on both 'pre and post-incarceration factors.'" *Fletcher*, 433 F.3d at 871 (quoting 28 DCMR § 204.1). Under this framework, the D.C. Parole Board used four factors to determine suitability for parole: two pre-incarceration factors, (i) the degree of risk and (ii) the type of risk; and two post-incarceration factors, (iii) institutional adjustment and (iv) program participation. *See* D.C. Guidelines Report at 5; *Cosgrove*, 703 F. Supp. at 1003.

The D.C. Parole Board intentionally did not employ an offense severity factor in its guidelines. *See* Memorandum from M. Stover, General Counsel, and R. Chickinell, Deputy

DSMDB-2353429v06

General Counsel, U.S. Parole Commission, to J.R. Clay, Jr., Acting Chairman, U.S. Parole

Commission at 2 (Aug. 21, 1992) ("[T]he D.C. guidelines do not contain an offense severity

dimension, nor do they prescribe ranges of months to be served.") (attached as Exhibit 3 to

Plaintiffs' Joint Statement) [hereinafter "1992 Stover Memorandum" or "1992 Stover Mem."].

Instead, the Board's policy was to let the "court-imposed sentence serve as its offense severity

indicant." D.C. Guidelines Report at 17; *see also* 1992 Stover Mem. at 2-3 ("[T]he D.C.

guidelines use the minimum term of the sentence . . . as the basic measure of accountability for

the offense, and apply a point score system . . . to determine whether or not the prisoner is

suitable for parole upon the completion of the minimum term."). Thus, the Board did not look to

the seriousness of the offense for which a D.C. Code offender was imprisoned. *See* D.C.

Guidelines Report at 4 ("[T]he Board of Parole does not and will not function in a manner that

might be viewed as a usurpation of the functions of the sentencing judge.").[2]

### A.    Degree of Risk

The primary factor affecting a parole candidate's suitability for parole under the D.C.

parole practices was the degree of risk of recidivism posed by the candidate. *See* D.C.

Guidelines Report at 5. The factor was based on a Salient Factor Score ("SFS") that relie[d]

---

[2] *See also* Memorandum from Michael A. Stover, General Counsel, USPC, to Michael J. Gaines, Chairman, USPC, at 3 (June 26, 1998) ("the guidelines of the D.C. Board of Parole clearly focus exclusively on the issue of risk") (attached as Exhibit 4 to Plaintiffs' Joint Statement) [hereinafter, the "1998 Stover Memorandum" or "1998 Stover Mem."]; Deposition of Gladys W. Mack ("Mack Dep.") at 42-43, *Cosgrove v. Meese*, No. 80-0516 (Mar. 18, 1988) (Chairperson of the D.C. Parole Board in 1988 testifying that the 1987 Regulations are premised on the principle that the court addresses the purposes of retribution and general deterrence identified in the D.C. Guidelines Report at 3-4) (attached as Exhibit 5 to Plaintiffs' Joint Statement); 63 Fed. Reg. 39172, 39174 (July 21, 1998) (recognizing that the "parole function for D.C. Code offenders rests on a premise somewhat different from that of the federal parole guidelines" and under which "the minimum term of imprisonment imposed by the court [is treated] as the usual measure of basic accountability for the offense of conviction").

    DSMDB-2353429v06

exclusively on information known at the time of incarceration." *Id.*; *see* 28 DCMR § 204.3

(attached as Exhibit 2 to the Plaintiffs' Joint Statement).

In calculating a prisoner's SFS, the D.C. Parole Board considered a parole

candidate's prior convictions and adjudications, prior commitments, age at the commission of the

current offense, commitment-free period, status at the time of the current offense, such as

whether the candidate was on parole or probation, and history of drug dependence. *See Fletcher*,

433 F.3d at 871 (citing 28 DCMR §§ 204.4-204.16). A parole candidate's SFS placed the

candidate into one of four risk categories from which the D.C. Parole Board would determine a

baseline number of points. *See* D.C. Guidelines Report at 5; 28 DCMR § 204.17 & App. 2-1.

The higher a candidate's SFS, the lower the risk the parole candidate would become a recidivist

and the lower the baseline number with which the candidate began for purposes of the Board's

further calculations. *See* 28 DCMR § 204.17 & App. 2-1 (App. 2-1 attached as Exhibit 6 to

Plaintiffs' Joint Statement). The Board then would adjust a candidate's baseline number using

the type of risk factor, and the candidate's institutional adjustment and program participation and

arrive at a total point score. *See* D.C. Guidelines Report at 5-6; 28 DCMR § 204.17.

### B.    The Type of Risk

The second factor that the D.C. Parole Board considered is what type of crime the

candidate could be expected to commit while released on parole. *See* D.C. Guidelines Report at

5. The type of risk factor was an "aggravating factor" that applied to those cases where "the

current offense, or the offender's pattern of past offenses, involved violence, weapons, or drug

trafficking." *Id.* Under the type of risk factor, the Board looked at three types of offense

behaviors as parole indicants: (1) violence, (2) use of a weapon, and (3) drug trafficking. *See id.*

at 21-22; 28 DCMR § 204.18 & App. 2-1. If the Board determined that a parole candidate's

"current offense, or two prior felony convictions involve[d] *any or all of* the listed behaviors,"

DSMDB-2353429v06

which were violence, the use of a weapon, and drug trafficking it would increase the baseline

number from the candidate's SFS by one point.  D.C. Guidelines Report at 21-22 (emphasis

added); *see* 28 DCMR § 204.18 & App. 2-1.  Thus, the Board considered a parole candidate with

any one of these risk indicants to present the same level of risk as a candidate with two or all of

these indicants.  *See* 28 DCMR § 204.18 & App. 2-1.

## C.    Institutional Adjustment

The D.C. Parole Board considered the candidate's institutional adjustment – whether

the candidate had committed serious disciplinary infractions while imprisoned for the current

offense.  Under the 1987 Regulations, the candidate's institutional adjustment was "an

aggravating factor applicable [where] the Board has made findings that disciplinary infractions

. . . are either serious or repetitious enough to impact negatively on the parole decision."  D.C.

Guidelines Report at 5.  Serious disciplinary infractions, it would increase a candidate's baseline

number by one point.  28 DCMR § 204.18(h).

## D.    Program Achievement

The final factor that the Board used considered was the candidate's program

achievement.  *See* 28 DCMR § 204.18 (i).  Under the 1987 Regulations, a parole candidate's

program participation was a "mitigating factor" that the Board applied when it found that the

candidate's program or work accomplishments were substantial enough to impact favorably on

the parole decision.  D.C. Guidelines Report at 5.  For sustained program achievement, the Board

would deduct one point from the candidate's point score.  *See* 28 DCMR at App. 2-1.

## E.    The Parole Decision

After the D.C. Parole Board calculated its "baseline" point score and adjusted it based

on the type of risk, institutional adjustment, and program achievement factors under the 1987

Regulations, the D.C. Parole Board "integrated [these factors] into a calculus to produce a *point*

9

*score which constrained the Board's discretion in making final parole determinations*."
*Fletcher*, 433 F.3d at 871 (citing 28 DCMR § 204.19 & App. 2-1) (emphasis added). This total
point score "determine[d] whether or not parole is granted, and if so, the level of supervision to
be imposed." D.C. Guidelines Report at 6.

A total point score of two or less at his or her initial parole hearing, the 1987
Regulations directed the Board to grant parole. *See* 28 DCMR § 204.18 & App. 2-1. At a parole
rehearing, the 1987 Regulations directed the Board to grant parole if the parole candidate had a
total point score of three or less. *See id.* & App. 2-2 (App. 2-2 attached as Exhibit 7 to Plaintiffs'
Joint Statement).

Regardless of a parole candidate's total point score, the 1987 Regulations permitted
the D.C. Parole Board to grant or deny parole in "unusual circumstances." *Id.* § 204.22. As the
Board recognized when it promulgated the 1987 Regulation, "there occasionally will be *unique
circumstances* that are not taken into account by either the Salient Factor Score or the type of
risk assessment, but that none-the-less should impact on the release decision." D.C. Guidelines
Report at 22 (emphasis added). The Board, however, had to explain the existence of such
"unusual circumstances" by reference to the specific aggravating or mitigating factors listed in
Appendices 2-1 and 2-2. 28 DCMR § 204.22.[3] In Appendix 2-1, the D.C. Parole Board listed
those pre-and post-incarceration circumstances that might warrant a departure. *See* 28 DCMR at
App. 2-1; Mack Dep. at 11-13, 22-25.

_____

[3] *See* Mack Dep. at 12-13 (testifying that the six aggravating factors in Appendix 2-1 of the 1987
Regulations indicating that a parole candidate was a worse risk than the candidate's total point
score indicated were the only pre-incarceration factors the Board could use to depart from the
guidelines and deny parole); D.C. Guidelines Report at 6 ("Decisions outside the guidelines may
be rendered for good cause when accompanied by written reasons that include a summary of the
information upon which the determination is based.").

In contrast to Appendix 2-1, Appendix 2-2, which applied at parole rehearings, did

not include any pre-incarceration aggravating factors on which the Board could rely to depart

from the regulations and deny parole. *See* Mack Dep. at 26-27. Because its primary focus was

rehabilitation, the D.C. Parole Board did not consider a parole candidate's current offense at a

parole rehearing, *see* Mack Dep. at 28. Appendix 2-2 instead, focused on the candidate's

rehabilitation, community resources, and health since the candidate's previous hearing, *see id.* at

26-27.

### F.    The D.C. Parole Board's 1991 Policy Guideline

To ensure consistent and equitable application of the 1987 Regulations, the Board

adopted a Policy Guideline that defined the terms used in the Appendices to the 1987

Regulations (the "1991 Policy Guideline") (attached as Exhibit 8 to Plaintiffs' Joint Statement).

*See* 1991 Policy Guideline at 1. The USPC's General Counsel, following this Court's decision

in the *Cosgrove* case, instructed the USPC personnel to apply the 1991 Policy Guideline when

conducting parole hearings for D.C. Code offenders in federal correctional facilities. *See*

Deposition of Rockne Chickinell at 78:15-18 ("Chickinell Dep.") (attached as Exhibit 9 to

Plaintiffs' Joint Statement); 1992 Stover Mem. at 2. The Board adopted the 1991 Policy

Guideline to avoid disparate decisions for similarly-situated offenders under the 1987

Regulations resulting from the subjective views and judgments of hearing examiners and

commissioners. *See* 1991 Policy Guideline at 1.

Section VI.A.1 of the 1991 Policy Guideline, established criteria defining "negative

institutional behavior" by listing the types of institutional disciplinary infractions that the D.C.

Parole Board considered to be "negative institutional behavior" under Appendices 2-1 and 2-2.

For purposes of a parole candidate's initial hearing, the 1991 Policy Guideline limited the

Board's consideration of disciplinary infraction to only those that the candidate committed in the

DSMDB-2353429v06

three years before the hearing, except in the case of offenses involving murder, manslaughter,

kidnapping, armed robbery, or first degree burglary. *See id.*

### G.     The D.C. Parole Board's Definition of Unusual Circumstances

The 1991 Policy Guideline also clarified the scope of the Board's authority to deny

parole for "unusual circumstances." To promote consistency in the Board's decisionmaking

regarding departures from the action indicated by a parole candidate's total point score, the 1991

Policy Guideline described the objective criteria and parameters for each of the factors listed in

Appendix 2-1 of the 1987 Regulations that the D.C. Parole Board recognized as constituting

"unusual circumstances." 1991 Policy Guideline at 6-9.

### III.     THE USPC'S PAROLE REGULATIONS AND PRACTICES

In 1998, after the USPC assumed the D.C. Parole Board's responsibilities with

respect to parole determinations for D.C. Code offenders, the USPC immediately drafted interim

parole regulations that were significantly different from D.C. parole practices. *See Fletcher*, 433

F.3d at 870. In 2000, the USPC published the 2000 Guidelines in final form and announced that

it would apply those guidelines to any D.C. Code offender, including Plaintiffs, who had not

received an initial parole hearing as of August 5, 1998. *See id.*

The USPC justified the 2000 Guidelines' changes to the 1987 Regulations on the

ground that its research and analysis allegedly demonstrated that the Board's point score system

had" resulted in a high rate of upward departures from the guidelines based upon factors that

should be included in the guidelines." 63 Fed. Reg. 17771, 17772 (Apr. 10, 1998). The USPC

also undertook an analysis "to identify factors related to current offense and criminal history that

[could] be empirically correlated with repeat violent crime." *Id.* For this study, sample of D.C.

Code offenders released in 1992 was evaluated to determine whether those offenders had an

arrest for a violent offense within five years after their release. *Id.* Despite data and process

deficiencies, the USPC determined that this research confirmed that violence and weapons were good predictors of future violence *See id.* at 39173. Based on these two studies, the USPC replaced the D.C. parole practices with the 2000 Guidelines for D.C. Code offenders receiving an initial parole hearing after August 5, 1998. *Id.*

### A.    Offense Accountability Under the 2000 Guidelines

The 2000 Guidelines apply a classic *federal parole guideline* principle, i.e., offense accountability, and allow the USPC to ignore this assumption in "exceptional cases" based on the gravity of a parole candidate's offense. *See* 28 C.F.R. § 2.73(b). Effectively, the 2000 Guidelines change the 1987 Regulations' "assumption" into a "presumption" that the USPC can ignore in "exceptional cases" based on "the gravity of the offense." *Id.*

Nowhere in the 1987 Regulations did the Board leave room to consider offense accountability when determining an inmate's parole suitability. *See* Mack Dep. at 46:22-47:2, 52:11-14, 53:7-10. Instead, the Board looked solely at the degree and type of risk of recidivism posed by a parole candidate and the candidate's institutional conduct (both positive and negative) to determine the candidate's suitability for parole. *See* D.C. Guidelines Report at 4; 1998 Stover Mem. at 3; 1992 Stover Mem. at 2-3.

### B.    The Presumption of Suitability Under the 2000 Guidelines

Like the 1987 Regulations, the 2000 Guidelines initially use a point score system to determine whether a candidate is presumed suitable for parole. This system, like the 1987 Regulations, begins with the calculation of a Salient Factor Score aimed at assessing the degree of risk that a parole candidate will become a recidivist. *See* 28 C.F.R. §§ 2.80(c) and 2.20. It then purports to look to the "type of risk" that the candidate poses, and finally factors in the candidate's institutional behavior. *See* 28 C.F.R. §§ 2.80(f), (j), and (k).

DSMDB-2353429v06

Unlike the 1987 Regulations, which rely on a parole candidate's total point score to determine whether a parole candidate is presumed suitable for parole, the 2000 Guidelines develop a "Base Point Score" that the USPC uses to identify a "Base Guideline Range," the number of months to add to the candidate's parole eligibility period to account for the SFS and type of risk factors. 28 C.F.R. § 2.80(f); *see* 65 Fed. Reg. at 70663; 28 C.F.R. § 2.80(l).[4] This system makes it impossible, absent an award of superior program achievement, for any person with a Base Point Score over three to establish a presumption of suitability for parole when he or she becomes eligible for parole, as the 1987 Regulations permitted.

After adding the Base Guideline Range to the parole eligibility period, the USPC then adds or subtracts periods of months to reflect negative institutional behavior and/or superior program achievement. *See* 28 C.F.R. § 2.80(l). The 2000 Guidelines refer to the final range of months as the Total Guideline Range and treat it as "the amount of time [an offender] may expect to serve with continued good conduct and ordinary program achievement." 65 Fed. Reg. at 70664. Until a parole candidate has served a period of time equal to the bottom of his or her Total Guideline Range, the candidate is presumed to be *unsuitable* for parole. *See* Chickinell Dep. at 117:18, 172:8-10; Howard Dep. at 49:18-9; Husk Dep. at 187:19-187:3.

Under the 1987 Regulations, a parole candidate often would have been presumed suitable for parole at the end of his or her minimum sentence. Under the 2000 Guidelines, the same candidate is now presumed unsuitable for parole until he or she has served his or her minimum sentence and an additional term indicated by the Base Guideline Range and/or for negative institutional behavior. *See* 28 C.F.R. § 2.80(h), (i), and (l).

---

[4] The Base Guideline Range represents "[t]he time [in excess of the candidate's parole eligibility period, i.e., minimum sentence] expected for the inmate to qualify for parole (assuming no disciplinary infractions and no ordinary program achievement)." 65 Fed. Reg. at 70663.

DSMDB-2353429v06

C.    The USPC's Changes in the 2000 Guidelines to the 1987
      Regulations' SFS and Type of Risk Assessments Increased the
      Period of Incarceration that Plaintiffs Had to Serve to Establish a
      Presumption that They Were Suitable for Parole

In addition to changing the 1987 Regulations' point score system into a range of

months, the 2000 Guidelines changed the factors considered under the SFS and type of risk

assessments. The USPC made these changes under the guise of improving the predictive value

of the 1987 Regulations and to reflect what the USPC perceived as the "unstructured

discretionary departures," by the D.C. Parole Board. 63 Fed. Reg. at 39173.

The 2000 Guidelines, like the 1987 Regulations, provide for a "type of risk" analysis

by looking at the parole candidate's history of violence, the use of a weapon, and/or the death of

a victim as a result of the candidate's crime. *See* 28 C.F.R. § 2.80(f). Unlike the 1987

Regulations, under which the most points a parole candidate could obtain for the "type of risk"

factor was a single point, the 2000 Guidelines treated the candidate's history of violence, use of a

weapon, and/or the death of a victim as distinct factors, each of which the USPC uses to

contribute points to a parole candidate's Base Point Score. In total, the 2000 Guidelines enabled

the USPC to give a parole candidate as many as 7 points based on the "type of risk" factor.

*Compare* 28 DCMR Appendix 2-1 *with* 28 C.F.R. § 2.80(f). Each point in excess of three

increases the period of incarceration that a candidate must serve in excess of his or her parole

eligibility period to be presumed suitable for parole. *See* 28 C.F.R. § 2.80(h).

The 2000 Guidelines divided the 1987 Guidelines "type of risk" analysis into two

categories. *See* 28 C.F.R. § 2.80(f). The USPC used Category II of the "type of risk" analysis to

adjust a parole candidate's Base Point Score by adding points based on the candidate's history of

violence, or use of a firearm in the current offense. *See* 28 C.F.R. § 2.80(f). For the Category III

adjustments, the USPC did not offer any empirical findings supporting its decision to increase a

parole candidate's Base Point Score, as it had for Category II. Instead, the USPC, without any

DSMDB-2353429v06

factual or legal support in the D.C. Parole Board's regulations, policies, or practices, "decided

that [extremely violent crimes such as murder and rape] present implied risk levels that would

either justify [1] repeated departures, or [2] the inclusion of the relevant factors in the guideline

system itself," which is what the USPC asserted it had chosen to do. 63 Fed. Reg. at 39173.

For any parole candidate serving a sentence for a crime of violence that resulted in

the death of the victim, such as Plaintiffs Carlton Martin, Charles Phillips, Tony Sellmon, Darius

Smith, and Benson West-El, the 2000 Guidelines automatically increase the Base Point Score by

*at least* five points. *See* 28 C.F.R. § 2.80(f). This translates into *at least* 18-24 months added

onto the period that the candidate had to serve to be presumed suitable for parole under the 1987

Regulations. *See*  28 C.F.R. § 2.80(h). If a candidate has any prior convictions for violent

offenses, the Base Point Score increases even more as does the additional period the candidate

has to serve to be presumed suitable for parole. *See* 28 C.F.R. § 2.80(f) and (h).

> **D.    The 2000 Guidelines Use a Parole Candidate's Negative Institutional Behavior to Increase the Period of Incarceration the Candidate Has to Serve to Establish Presumptive Parole Suitability**

The 2000 Guidelines, like the 1987 Regulations, take a parole candidate's

institutional behavior into account for purposes of parole determinations. Unlike the 1987

Regulations, the 2000 Guidelines determine a range of months under the provisions of 28 C.F.R.

§ 2.36 for any disciplinary infractions since the beginning of confinement on the current offense

in the case of an initial hearing, and "since the last hearing in the case of a rehearing." 28 C.F.R.

§ 2.80(j). The USPC then adds the range of months it calculates under 28 C.F.R. § 2.36 to the

parole candidate's Base Guideline Range and minimum sentence, to determine the period of

incarceration that the candidate must serve to be presumed suitabile for parole. *Id.* Unlike the

1987 Regulations, the 2000 Guidelines consider all disciplinary infractions received prior to

initial parole hearing, not just those within the three years prior to the parole hearing. Thus, the

DSMDB-2353429v06

2000 Guidelines allow the USPC to increase the periods of incarceration that a parole candidate

"may expect to serve" before being considered suitable for parole based on disciplinary

infractions that the D.C. parole practices would not have considered at all. *Compare* 28 C.F.R.

§ 2.36 *with* 1991 Policy Guideline at 2.

**E.     The 2000 Guidelines, Unlike the 1987 Regulations, Do Not Reward
a Parole Candidate's Ordinary Program Achievement By
Improving the Candidate's Prospects of Parole**

Pursuant to section 2.80(e)(1) of the 2000 Guidelines, the USPC assesses whether a

parole candidate "has demonstrated ordinary or superior achievement in the area of prison

programs, industries, or work assignments while under confinement for the current offense." 28

C.F.R. 2.80(e)(1). The 2000 Guidelines give the USPC the sole discretion of determining

whether the parole applicant's work and program achievements are to be considered "superior"

or "ordinary." Howard Dep. at 66:5-68:4. Per the USPC's guidelines, "if superior achievement

is found, the award for superior program achievement shall be one-third of the number of months

during which the prisoner demonstrated superior program achievement." 28 C.F.R. § 2.80(e). If

the USPC finds only "ordinary" program achievement, the parole candidate's Total Guideline

Range is completely unaffected. Under the 1987 Regulations and the D.C. parole practices, the

D.C. Parole Board used an objective standard, set forth in the 1991 Policy Guideline, to reward

"Sustained Program Achievement or Work Assignment Achievement." 1991 Policy Guideline at

3. Once the Board determined that a parole candidate demonstrated sustained program

achievement, the Board awarded the candidate a credit of one point, which the candidate could

use to offset points in his or her total point score.

F.    **The 2000 Guidelines Significantly Changed the Bases on which the USPC Could Depart from the Presumption that a D.C. Code Offender Was Suitable for Parole**

Like the 1987 Regulations, the 2000 Guidelines permit the USPC, in "unusual circumstances," to deny parole when a parole candidate has served sufficient incarceration to establish a presumption of parole suitability. The 2000 Guidelines define "unusual circumstances" as those "case-specific factors that are not fully taken into account in the guidelines, and that are relevant to the grant or denial of parole." 28 C.F.R. § 2.80(n).

Although the 2000 Guidelines provide examples of "unusual circumstances" similar to those utilized by the D.C. Parole Board, they do not define the criteria necessary to establish the applicability of those "unusual circumstances" as the D.C. parole practices did. 28 C.F.R. § 2.80(n)(2). The 2000 Guidelines also did not place any limit on the type of circumstance the USPC can deem "unusual," except to the extent that the circumstance cannot have been "fully taken into account in the guidelines." 28 C.F.R. § 2.80(n); *see* Husk Dep. at 132:18-12, 141:9-13. Thus, the 2000 Guidelines left it to the subjective whims of the USPC hearing examiners and/or Commissioners to identify a factor for which the USPC did not add a point to the Base Point Score and deem it an "unusual circumstance." *See id.* at 91:10--92:3. In contrast, the 1987 Regulations provided clear criteria, in the 1991 Policy Guideline, that the D.C. Parole Board applied to determine whether "unusual circumstances" existed. *See* 1991 Policy Guideline at 6-9.

Moreover, the 1987 Regulations did not consider offense severity or accountability factors as "unusual circumstances." Those factors already had been accounted for by the sentencing judge. Under the 2000 Guidelines, the USPC has identified offense severity and accountability factors as "unusual circumstances" warranting the denial of parole.

As discussed in greater detail below, the undisputed facts demonstrate that the USPC violated the Ex Post Facto Clause in deciding Plaintiffs' requests for parole by applying its 2000

Guidelines retroactively and ignoring the D.C. parole policies. The USPC's actions not only

increased the risk that Plaintiffs and other D.C. Code offenders will serve longer than they would

have under the D.C. parole practices, they also increased Plaintiffs' periods of incarceration, in

some cases by as much as eight years, based on offense severity factors that the D.C. Parole

Board did not use. As a result, the Court should grant Plaintiffs' motion for summary judgment

with respect to their claims based on the Ex Post Facto Clause.

## ARGUMENT

### I.    THE STANDARD FOR SUMMARY JUDGMENT

A party is entitled to summary judgment "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. Proc. 56(c). The facts regarding the issues addressed in this motion

are set forth in the accompanying Plaintiffs' Joint Statement of Material Facts Not in Dispute and

in the Plaintiffs' individual statements of undisputed facts filed contemporaneously with this

memorandum. The undisputed facts establish that the USPC has applied its parole regulations,

guidelines, policies, and practices retroactively to Plaintiffs and other D.C. Code offenders

instead of the parole regulations, guidelines, policies, and practices of the D.C. Parole Board that

governed parole decisions for D.C. Code offenders prior to August 5, 1998. As a result, the

USPC has created a significant risk that Plaintiffs will serve longer periods of incarceration as

punishment for their crimes.

### II.    THE EX POST FACTO CLAUSE PROHIBITS RETROACTIVE CHANGES TO PAROLE POLICIES THAT CREATE A SIGNIFICANT RISK OF PROLONGING A PRISONER'S INCARCERATION

The Ex Post Facto Clause of the United States Constitution prohibits a retroactive

increase in the punishment for a crime after its commission. *See* U.S. Const. art. I, § 9, cl. 3;

DSMDB-2353429v06

*Fletcher v. Reilly*, 433 F.3d 867, 877 (D.C. Cir. 2006). Under the Supreme Court's decision in

*Garner v. Jones*, 529 U.S. 244, 251 (2000), a retroactive change in a parole regulation, guideline,

or policy violates the Ex Post Facto Clause if it "creates a significant risk of prolonging [an

inmate's] incarceration." *See Fletcher*, 433 F.3d at 876-77. A party can demonstrate that the

retroactive application of a change in parole policy creates a "significant risk" in two ways:

(1) it can establish that "there are facial distinctions between the old and new parole/reparole

regimes"; or (2) it can introduce "'evidence drawn from the rule's practical implementation by

the agency'" showing that "'retroactive application [of the policy] will result in a longer period

of incarceration than under the earlier rule.'" *Id.* at 877 (quoting *Garner*, 529 U.S. at 255).

      To determine whether the retroactive application of a new parole regime violates the

Ex Post Facto Clause, the D.C. Circuit requires "a searching comparison" of the two parole

regimes. *Fletcher*, 433 F.3d. at 879. The Court must then use the information gleaned from this

comparison to determine whether the USPC's application of its own regulations, guidelines,

policies, and/or practices instead of the D.C. parole practices "created a significant risk that

[Plaintiffs would] be subjected to a lengthier incarceration than [they] would have been if the

Commission had adhered to the rules and practices of the D.C. Board." *Id.* at 879; *see also id.* at

877 (the "controlling inquiry 'is one of practical effect'").

      As demonstrated in the Plaintiffs' joint and individual statements of undisputed facts

and in supporting documents attached thereto, a searching comparison of the USPC parole

practices to the D.C. parole practices proves that:

> a. Under the D.C. parole practices, parole candidates convicted of
> committing a crime of violence resulting in the death of the victim, such as Plaintiffs
> Carlton Martin, Charles Phillips, Tony Sellmon, Darius Smith, and Benson West-El,
> could establish a presumption that they were suitable for parole after serving the
> minimum sentence imposed by the sentencing court, i.e., at parole eligibility. Under the
> USPC's parole practices, which use a parole candidate's "Base Point Score" to add a
> range of months to the candidate's parole eligibility period, these same candidates are

DSMDB-2353429v06

presumed *unsuitable* for parole until they serve at least 18 to 24 months longer than their parole eligibility dates.

      b. Under the D.C. parole practices, a parole candidate's negative institutional conduct, if any, was considered at his or her initial parole hearing only if the conduct was (i) significant, i.e., a Class I offense or two Class II offenses, and occurred in the three years prior to the hearing or (ii) involved murder, manslaughter, kidnapping, armed robbery, or first degree burglary. The USPC's parole practices, on the other hand, consider all conduct prior to an initial parole hearing regardless of significance or age and add a range of months for such conduct to a candidate's parole eligibility period, during which the candidate is presumed *unsuitable* for parole.

      c. Under D.C. parole practices, Plaintiffs' sustained program achievements improved their prospects for parole by reducing their total point scores. Under the USPC parole practices, these same achievements essentially are ignored and do not affect Plaintiffs' prospects for parole.

      d. Under D.C. parole practices, it was *assumed* that Plaintiffs satisfied offense accountability and the needs for punishment, general deterrence, and retribution when they served the minimum sentence imposed by the sentencing court and became eligible for parole and the D.C. Parole Board did not usurp the function of the sentencing judge by departing from this assumption to deny parole on the basis of offense severity characteristics. Under the USPC's parole practices, Plaintiffs are only *presumed* to have satisfied offense accountability after serving their minimum sentence, and the Defendants may ignore this presumption in "exceptional cases" based on the "gravity of the offense," which the USPC has deemed to include every crime of violence in which a victim dies.

      e. Under D.C. parole practices, the D.C. Parole Board applied the clearly defined parameters and criteria in the 1991 Policy Guideline and refused to look to offense severity characteristics to determine whether pre-incarceration "unusual circumstances" existed warranting a parole denial notwithstanding a parole candidate's presumptive suitability for parole. The USPC, however, ignores the parameters and criteria in the 1991 Policy Guideline and, in fact, has not even provided the policy guideline to some USPC hearing examiners. Furthermore, the USPC regularly denies parole on the basis of offense severity factors.

      f. The practical effect of each of these differences is that the period that Plaintiffs must serve under the D.C. parole practices to establish presumptive suitability for parole has been increased by the 2000 Guidelines. Plaintiffs continue to languish in prison, well after their parole eligibility dates, because the Defendants are unlawfully applying federal parole accountability standards when D.C. parole standards should apply.

Accordingly, Plaintiffs have demonstrated as a matter of law that the USPC violated, and

continues to violate, their rights under the Ex Post Facto Clause by failing to "adhere[] to the

rules and practices of the D.C. Board" in Plaintiffs' cases. *Fletcher*, 433 F.3d at 879.

III.        **THE 2000 GUIDELINES, ON THEIR FACE, CREATE A
            SIGNIFICANT RISK THAT PLAINTIFFS WILL SERVE LONGER
            PERIODS OF INCARCERATION THAN THEY WOULD HAVE
            UNDER THE D.C. PAROLE PRACTICES**

As the Supreme Court recognized in *Garner*, a party can establish an Ex Post Facto

Clause violation in the parole context by establishing that there are facial distinctions between

old and new parole regimes that create a significant risk of prolonging an inmate's incarceration.

*See* 529 U.S. at 255. In this case, the USPC cannot dispute that there are significant differences

between the 1987 Regulations and D.C. parole practices and the USPC's 2000 Guidelines and

parole practices. The USPC recognized these distinctions and, in fact, was concerned that its

changes to the D.C. parole practices might increase the length of incarceration served by D.C.

Code offenders. *See* Chickinell Dep. at 185:19-186:10 (attached as Exhibit 9 to Plaintiffs' Joint

Statement). Despite this concern, the USPC has never evaluated whether its application of its

parole practices instead of the D.C. parole practices has increased the length of D.C. Code

offenders' incarceration. *See id.* at 190:19-191:5.

On their face, the USPC parole practices increase the period of incarceration, or

create a significant risk of increasing the period of incarceration, for D.C. Code offenders. First,

the 2000 Guidelines change the factors and methodology used by the D.C. Parole Board to

evaluate the degree and type of risk of recidivism and a parole candidate's institutional behavior.

Second, the USPC parole practices change the D.C. Parole Board's *assumption* that a parole

candidate's court-imposed minimum sentence is the offense severity indicant and satisfies the

candidate's accountability for the offense into a *presumption* that the USPC can overcome in

"exceptional cases" based on the "gravity of the offense." Finally, the USPC's parole practices

change the D.C. Parole Board's interpretation of the "unusual circumstances" that permit a

denial of parole where a parole candidate has demonstrated presumptive suitability for parole.

**A.    The 2000 Guidelines Increased the Period of Incarceration that Plaintiffs Carlton Martin, Charles Phillips, Tony Sellmon, Daru Swinton, and Benson West-El Had to Serve to Be Presumed Suitable for Parole**

Under the 1987 Regulations, a parole candidate became eligible for parole after

serving his or her minimum sentence. The parole issue then turned from one of eligibility to one

of suitability. To determine a parole candidate's "presumptive suitability for parole," 1992

Stover Mem. at 3, the D.C. Parole Board calculated a point score by looking at the candidate's

degree and type of risk of recidivism and negative and positive institutional behavior. *See* 28

DCMR at App. 2-1. To assess a candidate's degree of risk, the D.C. Parole Board used a Salient

Factor Score to determine a baseline point score which it then adjusted upward to assess the type

of risk based on whether the candidate's current or past offenses involved violence, weapons,

and/or drug trafficking. *See id.* The Board then adjusted the point score upward by one point to

reflect the parole candidate's negative institutional behavior and/or downward by one point to

reflect positive institutional behavior. *See id.*

If a parole candidate had a final point score of two or less at his or her initial hearing,

the D.C. Parole Board presumed that the candidate was suitable for parole. *See* 28 DCMR.

§ 204.18. The D.C. Parole Board, however, could overcome that presumption in "unusual

circumstances." *Id.* § 204.22.

The 2000 Guidelines significantly altered this process and the criteria used by the

Board used to assess a candidate's suitability for parole. They did so by changing the impact of

the degree and type of risk of recidivism assessments and of a parole candidate's institutional

behavior.

DSMDB-2353429v06

1.    The 2000 Guidelines Increase the Period of Incarceration that
D.C. Code Offenders with Current Offenses Involving
Violence and the Death of the Victim, or Who Have Prior
Convictions, Must Serve to Be Presumed Suitable for Parole

The 2000 Guidelines replaced the degree and type of risk of recidivism assessments

under the 1987 Regulations, *see* 28 DCMR §§ 204.17, 204.18, & App. 2-1, with a "Base Point

Score" that the USPC tied to a range of months, the "Base Guideline Range," *see* 28 C.F.R.

§ 2.80(f). The Base Guideline Range corresponds with an additional period of incarceration that

the USPC requires a parole candidate to serve beyond his or her parole eligibility date to be

presumed suitable for parole and to account for the factors reflected in the Base Point Score (i.e.,

the SFS, the parole candidate's history of violence, and the death of the victim). *See* Howard

Dep. at 49:18-50:9 (attached as Exhibit 11 to Plaintiffs' Joint Statement ); Chickenell Dep. at

170:18-172:10; Husk Dep. at 112:1-113:6 (attached as Exhibit 10 to Plaintiffs' Joint Statement).

In addition to changing the methodology to assess the degree and type of risk of

recidivism and establish a parole candidate's presumptive parole suitability, the USPC changed

the factors considered in those assessments. Significantly, the 2000 Guidelines increase the

number of points a parole candidate can receive under the 1987 Regulations' total point score for

the type of risk assessment (i.e., whether the candidate's current offense or prior offenses

involved violence, weapons, and/or drug trafficking) from one point to seven points, with each

point under the 2000 Guidelines corresponding with an increase in the period of incarceration the

parole candidate has to serve to be presumed suitable for parole. *Compare* 28 C.F.R. § 2.80(f)

*with* 28 DCMR at App. 2-1. The USPC accomplished this increase by replacing the 1987

Regulations' one point assessment for an offender whose current offense or two prior offenses

involved violence, weapons, *and/or* drug trafficking with two separate categories of point

assessments: (1) a one to four point assessment for violence or a firearm in the current offense or

violence in the current and/or prior offenses *and* (2) a one to three point assessment for the death

DSMDB-2353429v06

of the victim, a crime where the most probable result was the death of the victim (including

attempted murder, conspiracy to commit murder, and solicitation to murder), or a crime

involving "high level violence." 28 C.F.R. § 2.80(f).

Because of this change to the criteria for the type of risk assessment, every D.C. Code

offender convicted of a crime of violence that resulted in the death of the victim, including

Plaintiffs Carlton Martin, Charles Phillips, Tony Sellmon, Darius Smith, and Benson West-El,

has a minimum Base Point Score under the 2000 Guidelines of five (a minimum of two points

for violence in the current offense and three points for the death of the victim), which adds at

least 18 to 24 months to the offender's parole eligibility period that the offender must serve to be

presumed suitable for parole. *See* Howard Dep. at 62:1-5; Chickinell Dep. at 209:18-210:5;

Husk Dep. 122:4-123:16. If a D.C. Code offender has prior convictions for crimes of violence or

is a poorer risk based on his or her SFS, the Base Point Score and period of post-parole eligibility

incarceration increase, as they did for Plaintiffs Martin and West-El as a result of their lower

SFSs. *See* Martin Statement ¶¶ 4-6; West-El Statement ¶¶ 4-5. Similarly, D.C. Code offenders

convicted of crimes involving "high level violence" like kidnapping or carjacking, such as

Plaintiff Swinton, have a minimum Base Point Score of three under the 2000 Guidelines, which

can be increased by either the points added by the SFS (2 in Plaintiff Swinton's case) or points

attributable to prior offenses of violence. *See* Swinton Statement ¶¶ 4-5.

Thus, under the 2000 Guidelines, it is impossible for D.C. Code offenders convicted

of a crime of violence that resulted in the death of the victim to be presumed suitable for parole

when they become eligible for parole, as they could have done under the D.C. parole practices.[5]

---

[5] The only exception is when the USPC grants a parole candidate an award for significant
program achievement, which potentially could offset the Base Guideline Range. Only in
Plaintiff Sellmon's case did the USPC award superior program achievement sufficient to offset
the Base Guideline Range.

DSMDB-2353429v06

In the ordinary case, i.e., absent "unusual circumstances," D.C. Code offender who was

presumed suitable for parole under the 1987 Regulations would be paroled. *See* Chickinell Dep.

at 218:13-219:21. On the other hand, under the 2000 Guidelines, the USPC presumes that each

such D.C. Code offender is *unsuitable* for parole until he or she has served at least 18 months

beyond his or her parole eligibility date, and in the ordinary case, the USPC will deny parole

until the offender has served such additional time. *See* Chickinell Dep. at 216:17-217:21.

By reversing the presumption of parole suitability to which these Plaintiffs were

entitled under D.C. parole practices, the changes made by the 2000 Guidelines to the D.C. parole

practices violate the Ex Post Facto Clause because they clearly disfavor offenders convicted of a

crime of violence and create a significant risk of prolonging Plaintiffs' incarceration. *See*

*Fletcher*, 433 F.3d at 877; *see also Garner*, 529 U.S. at 253 ("The danger that legislatures might

disfavor certain persons after the fact is present even in the parole context, and . . . the Ex Post

Facto Clause guards against such abuse."). As a result of these changes, Plaintiffs must serve at

least 18 months beyond their parole eligibility date (36 months in Plaintiff West-El's case and 54

months in Plaintiff Martin's case because of these plaintiffs' lower SFSs)[6] to be presumed

suitable for parole; under the D.C. parole practices, these Plaintiffs would have been presumed

suitable for parole at eligibility. *See* West-El ¶ 5; Martin ¶ 5.

    2.    The 2000 Guidelines Increase the Period of Incarceration that
            D.C. Code Offenders with Disciplinary Infractions Must Serve
            to Be Presumed Suitable for Parole

Like the 1987 Regulations, the 2000 Guidelines evaluate a D.C. Code offender's

negative institutional behavior and use that behavior to adjust the USPC's consideration of

---

[6] As Plaintiffs demonstrated at the deposition of Stephen Husk, the USPC miscalculated Plaintiff
Martin's SFS by failing to give him credit for not having been on parole or probation at the time
he committed his offense. Applying a correct SFS to Plaintiff Martin reduces the SFS
contribution to his Base Point Score by one point and his Base Guideline Range to 36-48
months. *See* Husk Dep. at 148-49.

                                   DSMDB-2353429v06

whether the candidate is presumed suitable for parole. The 2000 Guidelines make this adjustment by adding a range of months to a candidate's parole eligibility period that the candidate must serve in addition to the Base Guideline Range, to be presumed suitable for parole. Unlike the D.C. parole practices, the 2000 Guidelines place no limit on the nature or age of the disciplinary infractions that the USPC considers.

Instead, the 2000 Guidelines direct the USPC, at an initial parole hearing, to look to the federal rescission guidelines at 28 C.F.R. § 2.36 for each incident of negative institutional behavior "*since the beginning of confinement* on the current offense." 28 C.F.R. § 2.80(j) (emphasis added). In Plaintiff Smith's case, the USPC added 88 months to Mr. Smith's parole eligibility period and Base Guideline Range based on disciplinary infractions Mr. Smith received more than six years before his initial parole hearing. *See* Smith Statement ¶ 6. In Plaintiff West-El's case, the USPC added 24 months to Mr. West-El's parole eligibility period and the bottom of his Base Guideline Range based on two disciplinary reports he received in 1989 and 1983, more than twelve years before his initial parole hearing in April 2002. *See* West-El Statement ¶ 6.

Under the 1987 Regulations, the D.C. Parole Board did not consider institutional infractions that occurred more than three years before a parole candidate's initial parole hearing as negative institutional behavior, unless the infractions involved murder, manslaughter, kidnapping, armed robbery, or first degree burglary. *See* 1991 Policy Guideline at 2. Thus, under the D.C. parole practices, neither Mr. Smith's six-year-old disciplinary infractions nor Mr. West-El's twelve-year-old disciplinary infractions would have been considered "negative institutional behavior," and those infractions would not have affected the period of incarceration that these Plaintiffs had to serve to be presumed suitable for parole. *See id.*

DSMDB-2353429v06

The changes to the D.C. parole practices made by the 2000 Guidelines, thus, allow the USPC to presume that parole candidates like Plaintiffs Smith and West-El, are *unsuitable* for parole until they serve the period of incarceration that the 2000 Guidelines add to their parole eligibility period and Base Guideline Range to account for any disciplinary infractions they received <u>since the beginning of their confinement</u> on the current offense.[7] Under the D.C. parole practices, on the other hand, Plaintiffs Smith and West-El would have been presumed *suitable* for parole at the end of their parole eligibility period because they received disciplinary infractions more than three years before their initial parole hearing, and those infractions did not involve an offense of murder, manslaughter, kidnapping, armed robbery, or first degree burglary. These changes, therefore, reversed the presumption of parole suitability that would have applied at Plaintiffs' parole eligibility date under the D.C. parole practices, creating a significant risk of prolonging the incarceration of Plaintiff Darius Smith and Plaintiff Benson West-El in violation of the Ex Post Facto Clause. *See Fletcher*, 433 F.3d at 877. Under the 2000 Guidelines, Plaintiff Smith must serve 88 months beyond his parole eligibility date and Plaintiff West-El had to serve 24 months beyond his parole eligibility date to establish the same presumption of parole suitability that they would have been entitled to under the D.C. parole practices when they became eligible for parole.

---

[7] Notwithstanding the 2000 Guidelines language limiting the USPC's consideration to "significant" disciplinary infractions, the USPC applies 28 C.F.R. § 2.36 to even administrative infractions, for which it adds 0 to 2 months to an inmate's Total Guideline Range. Husk Dep. 165:14-166:6. As a result, while not affecting the bottom of the Total Guideline Ranges of Plaintiffs Martin and Phillips, the USPC increased the top of the Total Guideline Ranges for these Plaintiffs by two months for each administrative disciplinary infraction (2 months in Plaintiff Martin's case and 24 months in Plaintiff Phillips's case, but based on disciplinary infractions more than 15 years old). *See* Martin Statement ¶ 5; *see also* Phillips Statement ¶ 6.

    DSMDB-2353429v06

> 3.    The 2000 Guidelines Eliminate the Impact Under the 1987
>        Regulations of a D.C. Code Offender's Ordinary Rehabilitative
>        Efforts and Drastically Change the Weight Such Efforts Are
>        Accorded

Under the D.C. Parole Board's 1987 Regulations, D.C. Code offenders could

positively affect their presumptive suitability for parole by demonstrating "sustained

achievement in the area of prison programs, industries, or work assignments" during their

incarceration. 28 DCMR at App. 2-1. By demonstrating such achievement, a D.C. Code

offender could reduce his or her total point score by one point, thus, offsetting a one point

increase in the point score resulting from the type of risk assessment or from negative

institutional behavior. Under the 1987 Regulations, the D.C. Parole Board accorded a parole

candidate's program and work achievement weight equal to the weight it accorded the type of

risk and negative institutional behavior assessments.

Under the 2000 Guidelines, however, a parole candidate sustained program or work

achievement simply maintains his or her entitlement to a presumption of parole suitability once

he or she serves the minimum of the Total Guideline Range. *See* 28 C.F.R. § 2.80(e).[8] To

positively affect the minimum period that a parole candidate must serve to establish presumptive

suitability for parole, the candidate must demonstrate "superior program achievement," which

the 2000 Guidelines define as "program achievement that is beyond the level that the prisoner

might ordinarily be expected to accomplish." *Id.* As the USPC's witnesses have testified,

whether program achievement is "superior" is a purely subjective, discretionary decision by

---

[8] The 2000 Guidelines indicate that a parole candidate's complete failure to participate in
programming warrants a decision in the upper half of his or her Total Guideline Range. *See* 28
C.F.R. § 2.80(e)(2). Thus, a parole candidate must demonstrate ordinary program achievement
or the USPC will presume the candidate to be unsuitable for parole until he or she has served in
excess of the midway point between his or her minimum and maximum Total Guideline Range.
*See id.* §§ 2.80(e) & (l).

DSMDB-2353429v06

USPC hearing examiners and Commissioners. *See* Howard Dep. at 68:14-69:3; Chickinell Dep.

At 150:14-22.

When the USPC applied the 2000 Guidelines at Plaintiffs' initial hearings, the USPC

only considered whether Plaintiffs had demonstrated "superior program achievement" for any

portion of the period prior to their parole hearing. If the USPC determined that Plaintiffs had, it

reduced their Total Guideline Range by 1/3 of the period for which it determined they had

demonstrated such achievement. *See* 28 C.F.R. § 2.80(k). The USPC did not consider whether

Plaintiffs had demonstrated sustained program achievement, which would have entitled them to a

mitigating factor under the 1987 Regulations that was sufficient to overcome an aggravating

factor that they received for the type of risk assessment.[9]

Because of the 2000 Guidelines' changes to the D.C. Parole Board's treatment of

sustained program achievement, the USPC has created a significant risk that D.C. Code

offenders, such as Plaintiffs, will remain in prison longer than they would have under D.C.

parole practices. The USPC's changes not only deprived Plaintiffs of the benefits of a positive

adjustment to the score that determines their presumptive suitability for parole, but they

significantly reduced the weight accorded by the D.C. Parole Board ascribed to a parole

candidate's sustained program and work assignment achievement. Out of all of the Plaintiffs to

which the USPC applied its 2000 Guidelines, only Plaintiff Sellmon received a superior program

---

[9] Under the 1987 Regulations, Plaintiffs Martin, Phillips, Sellmon, Smith, and West-El did not
have negative institutional behavior during the three years prior to their initial parole hearing
sufficient under D.C. parole practices to warrant an increase in their total point score. *See* Martin
Statement ¶ 5; Phillips Statement ¶ 6; Sellmon Statement ¶ 5; Smith Statement ¶ 6; West El-
Statement ¶ 6. Thus, each would have been able to offset the one point that the 1987 Regulations
would have added to the total point score based on the type of risk assessment with the one point
reduction to which they were entitled if they had demonstrated sustained program or work
assignment achievement. Plaintiff Swinton, who had a single disciplinary report in the three
years before his initial parole hearing, would have been able to offset the increase in his total
point score based on that disciplinary report with the one point reduction to which he would have
been entitled if he had demonstrated sustained program or work assignment achievement.

     DSMDB-2353429v06

achievement award that exceeded the period of incarceration that the USPC added to his parole

eligibility period as a result of his Base Point Score.  Notably, he received this award only after

successfully challenging, through a petition for a writ of habeas corpus, the USPC's refusal to

grant him the award.  *See* Sellmon Statement ¶ 8.

> **B.**     **The 2000 Guidelines Eliminate the Assumption Under the 1987
> Regulations that the Minimum Sentence Imposed by the
> Sentencing Court Addresses Plaintiffs' Offense Severity and
> Accountability**

The 1987 Regulations did not contain an offense severity factor.  Instead, the D.C.

Parole Board assumed that the court-imposed, minimum sentence satisfied all offense severity

and accountability:

> The second principle behind the guidelines is that the court addresses the
> purposes of retribution and general deterrence through the sentence it
> imposes in adult cases.  *As a matter of policy, the Board of Parole does
> not and will not function in a manner that might be viewed as a usurpation
> of the functions of the sentencing judge. . . .*

D.C. Guidelines Report at 3 (emphasis added).  In describing the rationale for the 1987

Regulations, the D.C. Parole Board further explained that, although it was adopting the federal

parole guideline SFS structure, it:  "*did not wish to pattern entirely the structure of its guidelines

after the federal grid which includes an offense severity scale.*  It therefore looked to other

jurisdictions for a guideline structure that would be more compatible with *the Board's

philosophy of letting the court-imposed sentence serve as its offense severity indicant.*"  *Id.* at 17

(emphasis added); Mack Dep. at 43:8-22.

Thus, under the 1987 Regulations, once a D.C. Code offender served his or her

minimum sentence, the Board focused exclusively on the risk of recidivism and institutional

conduct/rehabilitation of the offender.  D.C. Guidelines Report at 4.  It did not look at the

severity of the candidate's offense to determine whether the judge's sentence was sufficient

punishment for the candidate's offense because doing so would usurp the sentencing judge's

function. *See id.* At 3-4. The Board's sole focus was on the candidate's rehabilitation and the risk to the community if the candidate was paroled. *See id.* At 17-24.

Although the 2000 Guidelines recognize the D.C. Parole Board's policy that the minimum term imposed by the court satisfies the need for punishment for the crime, the 2000 Guidelines expressly alter the 1987 Regulations' *assumption* that a parole candidate's service of the court-imposed minimum sentence satisfies offense accountability and changes that assumption into a *presumption* that the USPC can overcome in "exceptional cases" based on the "gravity of the offense." 28 C.F.R. § 2.73; 63 Fed. Reg. at 39174; *see also* 1998 Mem. at 3 (recommending adoption of an exception to the D.C. Parole Board's assumption despite the sparseness of case law supporting the exception and the fact that the 1987 Regulations focus exclusively on the issue of risk).[10] By creating an exception to the 1987 Regulations' policy based on the "gravity of the offense," the 2000 Guidelines allow the USPC to usurp the functions of the sentencing judge. Using this "exception" for "exceptional circumstances," the USPC has denied the parole requests of Plaintiffs Martin, Phillips, Sellmon, and Swinton based solely on the alleged seriousness of their offenses and accountability grounds. Thus, the 2000 Guidelines, on their face, not only create a significant risk that these Plaintiffs will serve longer periods of incarceration," but they have resulted in Plaintiffs' continued incarceration on grounds that violate the policies of the D.C. Parole Board. The very purpose of the Ex Post Facto Clause is to prevent such increased retroactive punishment.

> **C.    The 2000 Guidelines, Unlike the 1987 Regulations and D.C. Parole Board's Policies, Do Not Contain Formal Criteria for the "Unusual Circumstances" Identified in 28 C.F.R. § 2.80(n)(2) and,**

---

[10]  In the case of a D.C. offender convicted of a crime of violence that resulted in the death of the victim, the exception apparently always applies because under the 2000 Guidelines, such an offender can never be presumed suitable for parole after serving his or her minimum sentence, unless he or she receives a significant award for superior program achievement.

DSMDB-2353429v06

**Therefore, on Their Face, Create a Significant Risk of Prolonging a D.C. Code Offender's Incarceration**

Under the 1987 Regulations, once a parole candidate's total point score established his or her presumptive suitability for release, the D.C. Parole Board's discretion was limited to departing from that presumption only in "unusual circumstances." 28 DCMR § 204.22. In Appendix 2-1 of the 1987 Regulations, the D.C. Parole Board identified circumstances it considered to be "unusual" that would support a departure from the action indicated by a parole candidate's total point score under 28 DCMR § 204.18. To ensure equitable treatment of similarly-situated parole candidates and consistency in applying the factors in Appendix 2-1 and to avoid disparate interpretations and applications of those factors, the D.C. Parole Board adopted the 1991 Policy Guideline, which set forth specific, definitive "criteria and parameters for determining the applicability" of the factors listed in Appendix 2-1. *See* 1991 Policy Guideline at 1; Stover Mem. at 4 (instructing USPC hearing examiners to "*always consult the Policy Guidelines*" "*[w]hen considering reasons for departure from the point score or rehearing guidelines*" (emphasis in original)).

Although the 2000 Guidelines include descriptions of "unusual circumstances" similar to those used in D.C. parole practices, the 2000 Guidelines do not contain any "formal criteria" for determining whether those "unusual circumstances" exist as the D.C. parole practices did. *See* 28 C.F.R. § 2.80(n)(2). As a result of the 2000 Guidelines' elimination of any "formal criteria" for determining the applicability of the "unusual circumstances" listed in Appendix 2-1 to the 1987 Regulations, the USPC has created a significant risk that Plaintiffs and other D.C. Code offenders will serve longer periods of incarceration.

For example, the 2000 Guidelines identify an "Unusually extensive prior record (sufficient to make the offender a poorer risk than the 'poor' prognosis category)" as a factor that "may warrant a decision above the guidelines." 28 C.F.R. § 2.80(n)(2)(i)(C). The USPC

　　　　　　　　　　　　　　　　　　　　　　　　DSMDB-2353429v06

premised this "unusual circumstance" on the 1987 Regulations' listing of an "Unusually

Extensive or Serious Prior Record" as a factor countervailing a grant of parole. 28 DCMR at

App. 2-1. The 1987 Regulations and the 1991 Policy Guideline clearly limit the applicability of

this factor to circumstances where a parole candidate has "at least five felony convictions." *Id.*;

*see* 1991 Policy Guideline at 6. The 2000 Guidelines, on the other hand, leave it to the

unfettered discretion of the USPC, without providing any "formal criteria," determine whether

the unusual circumstance applies. As the USPC's General Counsel implicitly recognized in 1992

after this Court ordered the USPC to apply the 1987 Regulations to D.C. Code offenders in

federal custody, the USPC must apply the criteria for the factors listed in Appendix 2-1 of the

1987 Regulations that the D.C. Parole Board applied to avoid the risk of increasing a D.C. Code

offender's period of incarceration. *See* Stover Mem. at 4.

IV.    **THE USPC'S PRACTICAL IMPLEMENTATION OF THE 2000
       GUIDELINES HAS RESULTED IN PLAINTIFFS SERVING LONGER
       PERIODS OF INCARCERATION**

In *Garner*, the Supreme Court also recognized that a party can establish an Ex Post

Facto Clause violation by showing that a retroactive change in policy will result in a longer

period of incarceration than under the earlier rule. *See* 529 U.S. at 255. The USPC's

implementation of the 2000 Guidelines demonstrates such an Ex Post Facto Clause violation by

showing that Plaintiffs will serve, and have served, longer periods of incarceration than they

would have under the D.C. Parole Board's parole regime. As the facts demonstrate, under the

2000 Guidelines, the USPC presumed that Plaintiffs were *unsuitable* for parole at their initial

parole hearing. Had the USPC applied the 1987 Regulations, each of these Plaintiffs would have

been *presumed* suitable for parole at their initial hearings.

Once some of the Plaintiffs had established presumptive parole suitability under the

2000 Guidelines, the USPC, under the guise of "unusual circumstances," denied these Plaintiffs'

DSMDB-2353429v06

parole requests on offense severity and accountability bases that should only apply to United States Code offenders. By doing so, the USPC changed the parole inquiry from the 1987 Regulations' focus on rehabilitation and risk to an inquiry in which the USPC asks whether, "upon consideration of the nature and circumstances of the offense and the history and characteristics of the prisoner," a D.C. Code offender's release would "depreciate the seriousness of his offense or promote disrespect for the law"? 28 C.F.R. § 2.18. The result of the USPC's application of the federal parole criteria to Plaintiffs has been repeated parole denials based on offense severity and accountability characteristics that the D.C. Parole Board deemed to be the function of the court-imposed minimum sentence. Presently, plaintiffs remain incarcerated despite the lack of any actual "unusual circumstances" in their cases recognized under the 1987 Regulations.

Finally, the USPC, in applying the 2000 Guidelines, has used the same offense severity and accountability factors over and over at Plaintiffs' parole rehearings to deny parole. The 1987 Regulations' focus at parole rehearings is solely on post-incarceration factors to determine whether "unusual circumstances" exist. The USPC's repeated use of the same pre-incarceration factors on which it relied to deny parole at an earlier hearing is inconsistent with the D.C. Parole Board's policies and practices under the 1987 Regulations, and has increased the period of incarceration that Plaintiffs have had to serve.

### A.     The USPC Increased Plaintiffs' Period of Incarceration by Applying the 2000 Guidelines at Their Initial Parole Hearings

At Plaintiffs' initial parole hearings, Plaintiffs would have had the following total point scores under the D.C. Parole Board's 1987 Regulations:

1.     Carlton Martin: 1 (+1 for being a fair risk with an SFS of 6 or 7, +1 for type of risk with current offense involving violence and a firearm, and -1 for sustained program achievement);

DSMDB-2353429v06

2.    Charles Phillips: 0 (+0 for being a low risk with an SFS of 9, +1 for type of risk with current offense involving violence, and -1 for sustained program achievement);

3.    Tony Sellmon: 0 (+0 for being a low risk with an SFS of 9, +1 for type of risk with current offense involving violence and a firearm, and -1 for sustained program achievement);

4.    Darius Smith: 1 (+1 for being a fair risk with an SFS of 8, +1 for type of risk with current offense involving violence and a firearm, and -1 for sustained program achievement);

5.    Daru Swinton: 2 (+1 for being a fair risk with an SFS of 6, +1 for type of risk with current offense involving violence and a firearm, +1 for negative institutional behavior within the three years prior to the initial hearing, and -1 for sustained program achievement); and

6.    Benson West-El: 1 (+1 for being a fair risk with an SFS of 8, +1 for type of risk with current offense involving violence and a firearm, and -1 for sustained program achievement).

If a parole candidate had a total point score of two or less at his or her initial parole hearing, i.e., when he or she became eligible for parole, as Plaintiffs did, the 1987 Regulations presumed that the candidate was suitable for parole. *See* 28 DCMR § 220.18; Stover Mem. at 3.

Under the 2000 Guidelines, the USPC used its Base Point Score, Base Guideline Range, and the guideline range for disciplinary infractions to determine Total Guideline Ranges – the total period of incarceration Plaintiffs must serve to be presumed suitable for parole under the 2000 Guidelines –to increase the Plaintiffs' minimum sentences by as much as 94 months. Until Plaintiffs served the minimum of their Total Guideline Range, the USPC presumed that these Plaintiffs were *unsuitable* for parole. *See* Howard Dep. at 49:18-50:9; Chickinell Dep. at 170:18-172:10; Husk Dep. at 112:1-113:6. The USPC's implementation of the 2000 Guidelines, thus, reversed the presumption of parole suitability to which these Plaintiffs were entitled under the 1987 Regulations once they served their minimum sentences and increased these Plaintiffs' incarceration by the period of the setoff that the USPC imposed before Plaintiffs' next parole hearing.

DSMDB-2353429v06

**B.    The USPC Increased the Period of Incarceration that Plaintiff Benson West-El Would Have Had to Serve Under the 1987 Regulations by Establishing a Presumptive Parole Date for Him at the Maximum of His Total Guideline Range**

At Benson West-El's initial parole hearing in 2002, the USPC denied his parole request on the basis that he had not served a sufficient period of incarceration to satisfy the minimum of his Total Guideline Range under the 2000 Guidelines. *See* West-El Statement ¶ 8. At his first parole rehearing in 2006, the USPC determined that Mr. West-El had served 278 months and that the minimum of his Total Guideline Range was 284. Despite the fact that Mr. West-El should have been presumed suitable for parole under the 2000 Guidelines six months after his first parole rehearing, *see* Husk Dep. 115:16-116:6, the USPC did not grant Mr. West-El immediate parole. West-El ¶ 20. Instead, the USPC established a presumptive parole date at the maximum of Mr. West-El's Total Guideline Range, i.e., after the service of 312 months, almost three years after his first parole rehearing. *See id.* In doing so, the USPC provided no explanation why it was requiring Mr. West-El to serve 28 months more than the minimum of his Total Guideline Range. *See id.*

Under the 1987 Regulations, Mr. West-El would have been presumed suitable for parole at his initial parole hearing in 2002 with a total point score of 1. *See id.* ¶ 14. At his first parole rehearing in 2006, Mr. West-El's total point score of 1 from his initial hearing would have been adjusted to account for his institutional behavior between 2002 and 2006. Because Mr. West-El had no disciplinary infractions and demonstrated sustained program achievement between his parole hearings, one point would have been subtracted from Mr. West-El's prior total point score, bringing his rehearing total point score to 0. *See id.* ¶ 18. Thus, Mr. West-El still would have been presumed suitable for parole under the 1987 Regulations at his parole rehearing. Given that the USPC did not identify any "unusual circumstances" at Mr. West El's

DSMDB-2353429v06

parole rehearing warranting a departure from this presumption of parole suitability, Mr. West-El

would have been paroled under the 1987 Regulations. *See id.* ¶ 20.

As a result of the USPC's application of the 2000 Guidelines to Mr. West-El's case,

Mr. West-El has served almost six years more than his minimum sentence, at which he would

have been presumed suitable for parole under the 1987 Regulations. In fact, given the USPC's

setoff of Mr. West-El to a presumptive parole date in March of 2009, Mr. West-El will serve

seven years more than his minimum sentence and the period that he would have had to serve

under the 1987 Regulations.[11]

> **C.    By Using the Definitions of "Unusual Circumstances" Under 28 C.F.R. § 2.80(n) and "Exceptional Cases" Under 28 C.F.R. § 2.73(b) of the 2000 Guidelines to Deny Parole Based on Offense Severity and Accountability Factors, the USPC Has Increased the Period of Incarceration that Plaintiffs Must Serve and Usurped the Functions of the Sentencing Judge in Direct Contravention of the D.C. Parole Board's Policy and Philosophy Under the 1987 Regulations**

Under the 1987 Regulations, once a parole candidate's total point score established

his or her presumptive suitability for release, the D.C. Parole Board's discretion was limited to

departing from that presumption only in "unusual circumstances." 28 DCMR § 204.22; *see*

Mack Dep. at 12:21-13:2. The D.C. Parole Board recognized the need for the discretion to

depart in "unusual circumstances" given the limitations of the "Salient Factor Score" and "type

---

[11] At the November 8, 2007 deposition of Rockne Chickinell, the USPC's General Counsel, Plaintiffs pointed out a discrepancy between the April 12, 2006 Notice of Action in Mr. West-El's case, which indicated that the USPC was giving Mr. West-El a presumptive parole date of January 5, 2009, and the USPC Order signed by the two USPC Commissioners acting on Mr. West-El's parole request, which indicated that Mr. West-El was being given a presumptive parole date of March 5, 2008, after the service of 312 months. Following Mr. Chickinell's deposition, Plaintiffs' counsel pointed out to Defendants' counsel that given Mr. West-El's jail credit time, the March 5, 2008 date would correspond with the service of 312 months. Although Mr. Chickinell suggested at his deposition that the USPC might investigate the discrepancy, no action has been taken to date of which Plaintiffs are aware.

of risk assessment" in the 1987 Regulations. As the Board explained when it promulgated the

1987 Regulations: "The Board of Parole recognizes that, when applying guidelines to individual

cases, there occasionally will be <u>unique circumstances</u> that are *not taken into account by either*

*the Salient Factor Score or the type of risk assessment*, but that none-the-less should impact on

the parole decision." D.C. Guidelines Report at 22 (emphasis added). Given that the "Salient

Factor Score" and "type of risk assessment" adopted by the D.C. Parole Board did not contain

offense severity or accountability factors (because the Board assumed that such factors were

addressed by the sentencing judge in the court-imposed minimum sentence), the Parole Board

did not consider such factors as valid "unique circumstances" for purposes of exercising its

discretion to depart from the guidelines – after all, exercising discretion based on such factors

would usurp the function of the sentencing judge. *See id.* at 3, 17, 22.

       As a result, in Appendix 2-1 of the 1987 Regulations, the D.C. Parole Board

identified exclusive factors addressing the degree and type of risk posed by a parole candidate

that it considered to be "unusual" that would support a departure from the action indicated by a

parole candidate's total point score under 28 DCMR § 204.18. To further ensure equitable

treatment of similarly-situated parole candidates and consistency in applying the factors in

Appendix 2-1 and to avoid disparate interpretations and applications of those factors, the D.C.

Parole Board adopted the 1991 Policy Guideline, which set forth specific, definitive "criteria and

parameters for determining the applicability" of the factors listed in Appendix 2-1. *See* 1991

Policy Guideline at 1; Stover Mem. at 4 (instructing USPC hearing examiners to "*always consult*

*the Policy Guidelines*" "*[w]hen considering reasons for departure from the point score or*

*rehearing guidelines*" (emphasis in original)). Recognizing the rehabilitative premise of its 1987

Regulations, the D.C. Parole Board also included among the "unusual circumstances" on which

it could depart a parole candidate's "Serious Negative Institutional Behavior," failure or "Little

DSMDB-2353429v06

Effort to Engage in Productive Programming or Work," and a need for "Programming to Remain

Crime-Free in the Community." *See* 1991 Policy Guideline at 6-9; Eason Statement ¶¶ 10, 12,

and 15.

The D.C. Parole Board, however, held true to its written and stated policy of deeming

the court-imposed minimum term sufficient accountability for the crime. Thus, nowhere in the

1987 Regulations or in the D.C. Parole Board's regulations, guidelines, or policy statements is

there any evidence that the Board considered offense severity and accountability factors in

determining whether a parole candidate had satisfied his or her offense accountability or whether

"unusual circumstances" existed sufficient to warrant denying a D.C. Code offender's parole

request where the 1987 Regulations' total point score indicated that the offender was

presumptively suitable for release.[12] The stated principle of the 1987 Regulations and policy of

the D.C. Parole Board was that the Board "does not and will not function in a manner that might

be viewed as a usurpation of the functions of the sentencing judge." D.C. Guidelines Report

at 4. In fact, the D.C. Parole Board expressly rejected adopting the federal parole guideline

model for this very reason:

> The Board, however, did not wish to pattern entirely the structure of its
> guidelines after the federal grid which includes an offense severity scale.
> It therefore looked to other jurisdictions for a guideline structure that
> would be more compatible with the Board's philosophy of letting the
> court-imposed sentence serve as its offense severity indicant.

*Id.* at 17.

---

[12] Although the 1987 Regulations permitted the D.C. Parole Board to depart from the guidelines
in circumstances where a parole candidate's offense involved unusual cruelty to victims or
preying on especially vulnerable victims, the Board did not do so on offense severity grounds.
Rather, the D.C. Parole Board's focus was on the risk posed to the public if it paroled an
offender who inflicted "[p]hysical, mental or emotional abuse beyond the degree needed to
sustain a conviction" or preyed on "[e]specially vulnerable victims, e.g., children or elderly
persons" through assaultive or fraudulent behavior." 1991 Policy Guideline at 7.

    DSMDB-2353429v06

The 2000 Guidelines, like the 1987 Regulations, limit the USPC's discretion to depart from a parole candidate's Total Guideline Range to "unusual circumstances." 28 C.F.R. § 2.80(n). Absent the existence of "unusual circumstances," the USPC cannot deny a D.C. Code offender's request for parole where the 2000 Guidelines indicate that the offender has served his Total Guideline Range. *See* Husk Dep. 133:1-7; 28 C.F.R. 2.80(n). Also like the 1987 Regulations, the 2000 Guidelines prohibit the USPC from considering offense accountability and severity factors in making its parole decision, except that the 2000 Guidelines permit the USPC to ignore this prohibition in "exceptional cases" based on the "gravity of the offense." 28 C.F.R. § 2.73(b).

Unlike the 1987 Regulations, the USPC's 2000 Guidelines, allow the USPC to consider as an "unusual circumstance" an almost limitless number of factors that are neither unusual, case-specific, nor unique and have no relation to either the degree or type of risk that a parole candidate poses to society, which was the sole focus of the D.C. Parole Board's 1987 Regulations. *See* Husk Dep. 91:10-92:3. The only limit as to what constitutes an "unusual circumstance" under the 2000 Guidelines is that the factor must be case-specific, cannot have been used to increase a parole candidate's Base Point Score (e.g., a prior crime of violence, which would increase the Category II score by one point, or the death of the victim, which increases the Category III score to three points), *and must be relevant to the grant or denial of parole*. *See* 28 C.F.R. § 2.80(n); Husk Dep. 132:18-12, 141:9-13. In practice, however, the USPC ignores the relevancy requirement because the USPC interprets it with respect to federal parole practices and not D.C. parole practices. *See* 28 C.F.R. § 2.18.

DSMDB-2353429v06

In each of Plaintiffs' cases, except those of Darius Smith and Benson West-El, the

USPC has cited offense accountability or severity factors as its basis for denying parole.[13]  In

Plaintiff Tony Sellmon's case, the hearing examiner at Mr. Sellmon's August 2005, Jeffrey

Kostbar, explained his recommendation that the USPC deny Mr. Sellmon's request for parole,

which the USPC accepted, as follows:

> This Examiner believes that *accountability for the offense behavior* not
> only is a consideration of the factors that go into the guideline calculation,
> but also factors that are outside of the calculation.  That would include the
> brutality exhibited by an offender in committing a murder.  In this case,
> our subject chose to beat a female victim to death by beating her in the
> head with a gun, thereby, causing massive head trauma and her ultimate
> death.  This methodology is extremely brutal.  I do not believe that it is
> captured by guidelines, which would suggest that the subject be paroled at
> a maximum guideline range of 110 months (9 years and 2 months).
> Further, *I do not believe that the extreme brutality of the offense is
> captured by his current service of nearly 14 years, or even by the next
> Reconsideration Hearing date, which would be scheduled after the service
> of approximately 17 years*, August 2005."

8-2-05 Hearing Summary at 3.  The USPC apparently considered Mr. Sellmon's offense

behavior to involve "unusual circumstances" under 28 C.F.R. § 2.80(n) and an "exceptional

case" under 28 C.F.R. § 2.73.  Even if such offense severity concerns were appropriate for

consideration under the D.C. parole practices, which they are not, there is nothing exceptional or

unusual about a death that results from beating a person to death, as opposed to shooting a person

in the head and causing death, that supports any conclusion that additional time is required to

---

[13] In Mr. Smith's and Mr. West-El's cases, the USPC did not even reach the issue of "unusual circumstances."  In Mr. Smith's case and Mr. West-El's case with respect to his initial parole hearing, the USPC denied parole because Mr. Smith and Mr. West-El had not served the additional months that the USPC improperly had added to their minimum sentences based on their Base Point Score and the disciplinary infractions that the D.C. Parole Board would not have considered under the 1987 Regulations.  In Mr. West-El's case with respect to his first rehearing, the USPC did not reach the issue of "unusual circumstances" because it granted him a presumptive parole date at the maximum of his Total Guideline Range, with no explanation why. West-El ¶ 20.

satisfy offense accountability for such offense behavior. As the USPC Case Operations Administrator testified, both would cause massive head trauma. Husk Dep. 228:8-20.

In Plaintiff Carlton Martin's case, the hearing examiner at Mr. Martin's March 2006 parole hearing recommended that Mr. Martin be paroled at the middle of his Total Guideline Range, which the hearing examiner felt "should be sufficient accountability and punishment for the offenses." *See* Martin Statement ¶ 16. The Executive Reviewer (a hearing examiner who does not participate in the actual hearing, but reviews the original hearing examiner's recommendation and either agrees or makes his or her own recommendation) for Mr. Martin's March 2006 parole request, whose recommendation the USPC adopted, however, disagreed saying: "The examiner is recommending release after approximately 15.5 years. This is not sufficient accountability for the death of the victim in addition to possession of a firearm during a drug offense." *See id.* (Executive Reviewer Denton's comments). Again, as Mr. Husk admitted at deposition, there is nothing unusual or unique about a person convicted of manslaughter or murder having a prior conviction involving possession of a weapon. *See* Husk Dep. At 213:20-214:4. Nevertheless, the USPC considers this offense severity factor a sufficient "unusual circumstance" under 28 C.F.R. § 2.80(n) and as an "exceptional case" under 28 C.F.R. § 2.73 to depart from the guidelines and usurp the sentencing judge's authority.

In Plaintiff Charles Phillips's case, the hearing examiner at Mr. Phillips's October 2005 parole hearing recommended that Mr. Phillips be paroled after he served 370 months, "which will hold him accountable for the two deaths of his victims and the stabbing" of the woman for which he cared. The Executive Reviewer disagreed and found that Mr. Phillips's crime required continued incarceration because it involved two deaths, for which Mr. Phillips received a 15-year to life sentence for each crime and for which Mr. Phillips had served more than 30 years total:

DSMDB-2353429v06

> The hearing examiner is recommending a release date after the service of
> approximately 31 years. This offense involved two murders and a
> stabbing. . . . The guidelines only take into consideration one murder. As
> a result, the second murder and assault are not considered in the
> computation of the guidelines. Phillips guidelines are 304-334 months.
> At the time of rehearing, he had served 335 months. The difference
> between the top of the range and the recommendation for a release date
> made by the examiner is 36 months. *Thirty-six months is not sufficient*
> *sanction for a second murder and aggravated assault.*

Phillips ¶ 14. (emphasis added).

Finally, in Mr. Swinton's case, the USPC denied Mr. Swinton's request for parole at

his initial hearing because Mr. Swinton had not served the additional months that the USPC

improperly had added to his minimum sentence based on his Base Point Score and Mr.

Swinton's disciplinary infraction. At Mr. Swinton's first parole rehearing in October 2006, the

hearing examiner recommended that the USPC grant Mr. Swinton parole after he had served 110

months, the top of Mr. Swinton's Total Guideline Range, because "[t]he top of the guidelines

should be sufficient accountability and punishment for the offense." *See* Swinton Statement

¶¶ 11-12. The Executive Reviewer for Mr. Swinton's October 2006 parole request, however,

disagreed stating that parole should be denied and Mr. Swinton should be given a three-year

setoff because:

> Subject is a more serious risk than indicated by his Base Point Score. The
> Score reflects 1 point in Category III for high level violence. The Score
> does not reflect that there were 3 victims in this case, a mother and her two
> young sons, who were held at gunpoint for over 3 hours while the mother
> was forced to drive to various ATMs and remove cash from her account
> while subject held a gun on her sons. I believe he is a more serious risk,
> noting that he was arrested in NY for possession of a weapon after he
> committed this offense and continued his propensity for weapons by
> having a sharpened metal blade in his possession while incarcerated.

All of these comments focus on Mr. Swinton's offense behavior, and none explain why the

USPC, which adopted the Executive Reviewer's recommendation, found the circumstances of

Mr. Swinton's case to be "unusual" based on some factor that made Mr. Swinton a greater risk

than any other armed robber or attempted kidnapper. Nor do these comments explain on what

basis Mr. Swinton's offense behavior qualifies as an "exceptional case" warranting a departure from the presumption in 28 C.F.R. § 2.73 that Mr. Swinton's minimum sentence satisfies the offense accountability for his crime. *See id.* ¶¶ 12-13.

The D.C. Parole Board did not consider offense severity and accountability factors in deciding parole. Instead, the 1987 Regulations deemed offense severity and accountability factors irrelevant to suitability for parole, because they assumed that the offender's minimum sentence fully addressed those factors. The USPC, on the other hand, appears to always consider offense severity and accountability factors and increases a D.C. Code offender's period of incarceration when it applies such factors to determine his or her suitability. Thus, it is no surprise that the USPC can identify a myriad of offense severity factors and assert that they are not accounted for in the Base Point Score, i.e., the SFS and type of risk assessment. As the Defendants former General Counsel recognized, the D.C. Parole Board never intended for the 1987 Regulations to include such sentencing court factors in the parole consideration. *See* Stover Mem. at 2-3.

As demonstrated above, the USPC's refusal, in implementing the 2000 Guidelines, to recognize this limitation on its discretion to deny parole for Plaintiffs and other D.C. Code offenders has led to repeated departures where suitability for parole should have been presumed. These departures are based on nothing more than the USPC's belief that Plaintiffs needed more punishment. Plaintiffs not only should have been presumed suitable for parole at their initial parole hearings, but they should have been paroled absent the USPC's identification of case-specific, unique circumstances associated with the degree or type of risk they pose if paroled and not associated with offense severity or accountability. *See* D.C. Guidelines Report at 22.

DSMDB-2353429v06

## CONCLUSION

For the reasons stated herein, Plaintiffs' motion for partial summary judgment should be granted.


Dated:  December 14, 2007                    Respectfully Submitted,


                                   By:    */s/ Jason D. Wallach*
                                          Jason D. Wallach (Bar No. #456154)
                                          Jared Rodrigues (Bar No. #496125)
                                          Avner E. Mizrahi (Bar No. #500772)
                                          DICKSTEIN SHAPIRO, LLP
                                          1825 Eye Street, NW
                                          Washington, D.C. 20006
                                          (202) 420-2268
                                          (202) 420-2201 facsimile


                                          Attorneys for Plaintiffs

DSMDB-2353429v06

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TONY R. SELLMON, et al., | : |
| Plaintiffs, | : |
| v. | : Civil Action No. 06-1650 (ESH) |
| EDWARD F. REILLY, JR., et al., | : |
| Defendants. | : |

## PLAINTIFF CHARLES PHILLIPS'S STATEMENT OF UNDISPUTED MATERIAL FACTS

1. On October 25, 1978, the Honorable H. Carl Moultrie of the D.C. Superior Court sentenced Plaintiff Charles Phillips to imprisonment for a term of thirty-five years and six months to life for assault with a deadly weapon, second-degree murder, second-degree murder, carrying a pistol without a license, and unlawful entry. *See* D.C. Sup. Ct. Judgment & Commitment/Probation Order of Charles Phillips (Oct. 25, 1978) (attached as Exhibit 1).

2. Under District of Columbia law, Mr. Phillips became eligible for parole on February 8, 2003. *See* Sentence Monitoring Computation Data of Charles Phillips at 3 (Oct. 11, 2005) (attached as Exhibit 2). Under the District of Columbia Board of Parole (D.C. Parole Board") regulations, guidelines, policies, and practices ("D.C. parole practices"), Mr. Phillips satisfied accountability for his offense after serving his minimum sentence, that is, on his eligibility date. *See* 1992 Stover Mem. at 2-3 ("[T]he D.C. guidelines use the minimum term of the sentence (less good time) as the basic measure of accountability for the offense…" (attached as Exhibit 3 to the Plaintiffs' Joint Statement of Undisputed Facts ("Plaintiffs' Joint Statement")); *see also* D.C. Guidelines Report at 17 (attached as Exhibit 1 to the Plaintiffs' Joint Statement).

3.  On August 5, 1998, the United States Parole Commission and the Defendants

and/or their predecessors (collectively the "USPC") assumed the responsibility for making parole

release decisions for all eligible D.C. Code offenders, including Mr. Phillips.  *See* National

Capital Revitalization and Self-Government Act, Pub. Law. No. 105-133 § 11231(c), 111 Stat.

712 (1997).  The USPC promulgated guidelines ("the 2000 Guidelines") to be used in parole

determinations for D.C. Code offenders, including Mr. Phillips, who had their first hearings after

August 5, 1998.  28 C.F.R. § 2.80(a)(5).

4.  On November 19, 2002, the USPC conducted Mr. Phillips's initial parole hearing

under the 2000 Guidelines.  *See* Hearing Summary of Charles Phillips ("Hearing Summary") at 1

(Nov. 19, 2002) (attached as Exhibit 3).

5.  The USPC calculated Mr. Phillips's Salient Factor Score ("SFS") as a 9, placing

him in the very good risk category with a baseline point score of 0.  *See* Notice of Action for

Charles Phillips ("Notice of Action") at 2 (Dec. 13, 2002) (attached as Exhibit 4).  The USPC

then automatically added 5 points to Mr. Phillips's baseline point score because his offense was a

crime of violence that resulted in the death of the victim, producing a Base Point Score under the

2000 Guidelines of 5.  *Id.*  The USPC converted his Base Point Score of 5 to a Base Guideline

Range of 18 – 24 months, which it added to his parole eligibility period of 302 months.  *Id.* at 3.

The USPC subtracted 16 months for Superior Program Achievement.  *Id.*

6.  The USPC then added 0 – 24 months because of nine minor disciplinary

infractions Mr. Phillips received in 1987 or earlier, more than fifteen years before his initial

hearing.  *See* Hearing Summary at 1.  This produced a Total Guideline Range of 304 – 334

months for Mr. Phillips.  Notice of Action at 3.

7.  The USPC denied Mr. Phillips's request for parole on December 13, 2002,

deeming Mr. Phillips not yet suitable for parole – a decision outside the 2000 Guidelines.  *See*

2

Notice of Action at 1. Mr. Phillips had served 300 months by that date and was 4 months away

from the bottom of his Total Guideline Range of 304 – 334 months. *Id.* On the Notice of

Action, the USPC explained that its denial was based on its view that Mr. Phillipsf had not

satisfied accountability for his crime:

> On May 28, 1977, you stabbed an individual to death after luring him to
> your ex-girlfriend's apartment. You the[n] seriously assaulted her by
> stabbing her in the left side and cutting her on the wrist. After being
> arrested on this offense and released from custody, you broke into your
> ex-girlfriend's apartment on December 22, 1977, confronted her and her
> companion and shot her companion to death after an altercation. Your
> Base Point Score of 5 reflects 2 points assessed in Category II for violence
> and 3 points in Category III for death of a victim. However, the addition
> of these points capture[s] only the murder which occurred on May 28,
> 1977; stabbing of your ex-girlfriend on May 28, 1977, breaking and
> entering her apartment on December 22, 1977 and murdering her
> companion on the same date are not reflected in the Base Point Score.
> The Commission at your next hearing will consider the risk you pose to
> the community based on your homicidal acts not captured in the Base
> Point Score.

*Id.* at 1.

8. The USPC gave Mr. Phillips a three year set-off, setting a rehearing date for

November 2005. *Id.* This set-off was outside and above the guidelines because it set a rehearing

date later than the top of Mr. Phillips's Total Guideline Range. *See id.*

9. None of the infractions that the USPC considered in adding 0 – 24 months to Mr.

Phillips's minimum sentence and Base Guideline Range involved murder, manslaughter,

kidnapping, armed robbery, or first-degree burglary, and they occurred more than three years

(indeed, more than fifteen years) before Mr. Phillips's initial parole hearing on November 19,

2002. *See* Hearing Summary at 1.

10. Under the D.C. Parole Board's 1987 Regulations, Mr. Phillips would have

received an SFS of 9, placing him in the low risk category with a baseline point score of 0. *See*

28 D.C. Mun. Regs. app 2-1 ("DCMR Appendix 2-1") (attached as Exhibit 6 to Plaintiffs' Joint

Statement of Undisputed Material Facts ("Plaintiffs' Joint Statement")). One point would have

been added to Mr. Phillips's baseline point score under the type of risk assessment because the

current offense involved violence and one point would have been deducted from his baseline

point score because of sustained program achievement. *See id.*

11. Under the D.C. parole practices, the disciplinary infractions Mr. Phillips

received more than fifteen years before his initial parole hearing would not have been

considered, because the 1987 Regulations limited consideration of disciplinary infractions (other

than those for murder, manslaughter, kidnapping, armed robbery, and first degree burglary) to a

period of 3 years before a parole candidate's initial hearing. 1991 Policy Guideline at 2 (attached

as Exhibit 8 to Plaintiffs' Joint Statement). Therefore, Mr. Phillips would have had a Point

Assignment Grid Score ("total point score") of 0.

12. With a total point score of 0, Mr. Phillips would have been presumed suitable for

parole at his initial hearing under the 1987 Regulations with a low level of supervision. *See* 28

DCMR § 204.18.

13. Even if Mr. Phillips's disciplinary infractions were considered under the 1987

Regulations, Mr. Phillips would have received no more than one additional point for his

disciplinary infractions, increasing his total point score to a 1. *See id.* With a total point score

of 1, Mr. Phillips still would have been presumed suitable for parole at his initial hearing under

the 1987 Regulations with a high level of supervision. *See id.*

14. On October 27, 2005, the USPC conducted Mr. Phillips's rehearing under the

2000 Guidelines. *See* Reconsideration Hearing Summary of Charles Phillips at 1 (October 27,

2005) (attached as Exhibit 5). The USPC did not add or subtract any months from Mr. Phillips's

Total Guideline Range, which remained at 304 – 334 months. *Id.* at 2.

15. The Hearing Examiner who conducted Mr. Phillips's rehearing recommended

granting Mr. Phillips's request for parole on a date thirty-six months later than the top of Mr.

Phillips's Total Guideline Range for a presumptive parole date on December 25, 2008, after the

service of 370 months. *Id.* The Examiner explained that he was recommending an additional

thirty-six months above the top of Mr. Phillips's Total Guideline Range because he believed Mr.

Phillips had not yet satisfied accountability for his crime: "This examiner believes that the

subject should be given a presumptive parole date after service of 370 months, which will hold

him accountable for the two deaths of his victims and the stabbing of the women [sic] that he

cared for which he apologized for all of the crimes that he has committed." *Id.* at 2.

16.  The Executive Reviewer for Mr. Phillips's October 2005 parole rehearing,

however, rejected the Hearing Examiner's recommendation (which itself was outside and above

the guideline by three years) and instead recommended that the USPC deny Mr. Phillips's parole

request. *See id.* at 3.  The Executive Reviewer explained that his decision was based on his view

that Mr. Phillips had not satisfied accountability for the offense and on his view that the 2000

Guidelines did not sufficiently take into account Mr. Phillips's offense:

> I disagree with setting a release date at this hearing and recommend a
> reconsideration hearing in 36 months.  The examiner is recommending a
> release date after the service of approximately 31 years.  This offense
> involved two murders and a stabbing....It should be noted that the
> companion/victim was a police officer.  Phillips denied knowing the
> victim was a police officers [sic].  The guidelines only take into
> consideration one murder...  As a result, the second murder and assault
> are not considered in the computation of the guidelines.  Phillips
> guidelines are 304 – 334 months.  At the time of the hearing, he had
> served 335 months.  The difference between the top of the range and the
> recommendation for a release date made by the examiner is 36 months.
> ***Thirsty-six months is not sufficient sanction for a second murder and
> aggravated assault.*** *Id.* at 3 (emphasis added).

17.  The USPC rejected the Hearing Examiner's recommendation, adopted the

Executive Reviewer's recommendation, and departed from the 2000 Guidelines, denying Mr.

Phillips's request for parole.  Notice of Action of Charles Phillips at 1 (Nov. 18, 2005) (attached

as Exhibit 6).  On the Notice of Action, the USPC explained that it denied Mr. Phillips's request

for parole because it determined that he had not yet satisfied accountability for his crime and that

the 2000 Guidelines did not sufficiently take into account Mr. Phillips's offense: "Breaking and

Entering into her apartment on 12/22/77 and murdering of her companion on the same date are

not reflected in the Base Point Score." *Id.* The USPC gave Mr. Phillips a three year set-off,

setting a rehearing date for October 2008. *Id.*

      18.  Under the D.C. Parole Board's 1987 Regulations, Mr. Phillips's total point score

of 0 would not have changed from his initial hearing because a total point score of 0 is the lowest

possible score under the 1987 Regulations. *See* 28 D.C. Mun. Regs. app 2-2.

      19.  With a total point score of 0, Mr. Phillips would have been presumed suitable for

parole at his rehearing under the 1987 Regulations – just as he would have been at his initial

hearing. *See* 28 DCMR § 204.18.